**PAN AMERICAN PETROLEUM COR-PORATION, Appellant,**

v.

**B. B. ORR and W. R. Henderson, Appellees.**

**No. 20377.**

United States Court of Appeals
Fifth Circuit.

June 28, 1963.

J. K. Smith, Fort Worth, Chas. F. Potter, Tyler, Tex., for appellant.

Fred Erisman, Longview, Fred B. Werkenthin, Austin, Thomas W. Hathaway, Tyler, E. M. DeGeurin, Austin, Ben Johnson, Tyler, Tex., for appellees.

Before HUTCHESON, GEWIN and BELL, Circuit Judges.

GEWIN, Circuit Judge.

This is a slant-hole case; and the first one to reach this court. Pan American Petroleum Corporation[1] filed suit in the United States District Court for the Eastern District of Texas against B. B. Orr and W. R. Henderson to recover the value of oil and gas produced by defendants through two slant-holes. The defendant B. B. Orr was the lease operator and W. R. Henderson a working interest owner. It is undisputed that these defendants (appellees) produced oil and gas through two slant-holes surfaced on their lease, but bottomed under plaintiff's lease. The period involved began in 1948 and continued to 1962, when both wells were surveyed and shut in. Pan Am recovered a judgment, but its recovery was restricted to the amount of oil proved to have been taken within the two years next preceding the filing of the complaint.

Pan Am contends that its motion for an instructed verdict should have been granted, because the evidence showed as a matter of law that the two year statute of limitations was tolled under the facts proven; that Pan Am acted with reasonable diligence in making an investigation without discovering the fraud alleged; and that its investigation was effectively blocked or prevented by the acts of fraudulent concealment on the part of the defendants which lulled the plaintiff and reassured it that no fraud existed. The trial court refused to grant plaintiff's motion for judgment after the jury verdict was returned and denied its motion for a new trial.

The following broad, general rules are applicable in the circumstances of this case: (a) the two year statute of limitations is the appropriate limitation statute to be considered;[2] (b) limitation does not run and the statute is tolled in circumstances where the cause of action has been fraudulently concealed by the defendant and is not discovered by the plaintiff two years before filing suit if the plaintiff exercised reasonable diligence in seeking to discover the fraud after being put on inquiry;[3] and (c) even if there is fraudulent concealment by the defendant, the plaintiff is required to act with diligence in seeking to discover fraud after being put on inquiry; and if it failed to do so under all of the facts and circumstances of the case, the statute will not be tolled.[4]

1. Herein referred to as Pan Am.

2. Article 5526, Texas Revised Civil Statutes.

3. Owen v. King, 130 Tex. 614, 111 S.W.2d 695, 114 A.L.R. 859 (1938); McFaddin Wiess & Kyle Land Co. v. Texas Rice Land Co., Tex.Civ.App., 253 S.W. 916, aff'd Tex.Com.App., 265 S.W. 888; Citizens Nat. Bank v. Good Roads Gravel Co., Tex.Civ.App., 236 S.W. 153 (1922).

4. 54 C.J.S. Limitations of Actions § 206, p. 223; Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738, 150 A.L.R. 775 (1943); 37 Tex.Jur.2d 213, § 76; Phillips Petroleum Co. v. Johnson, 155 F.2d 185 (5 Cir., 1946).

At page 10 of its original brief, Pan Am makes this statement:

"We have stated plaintiff was put on inquiry."

The following is from the opinion in the Ruebeck case:

"Ordinarily, what constitutes reasonable diligence to discover fraud is a question of fact for the jury * * *. Unless the evidence is such that reasonable minds may not differ as to its effect, the question as to whether a party has exercised diligence in discovering fraud is for the jury."

The chief contention of Pan Am is that while it was possessed of sufficient facts to put it on inquiry as to the fraud involved, the conduct of the defendants was such that Pan Am was relieved of its duty to make further inquiry; and because its inquiry and investigation was blocked, diverted, thwarted and stopped by the trickery, stealth, fraudulent and dishonest conduct of the defendants. Thus it is claimed by Pan Am that the evidence showed as a matter of law that the statute was tolled and consequently there is no evidence to support the jury's verdict that it did not act with reasonable diligence as required by law.[5]

Accordingly, we come to the narrow question of whether there was sufficient evidence to submit the case to the jury touching the issues of fraudulent concealment by the defendants, knowledge on the part of Pan Am sufficient to put it on inquiry, and whether Pan Am acted with reasonable diligence in seeking to discover the fraudulent conduct of the defendants in light of all of the conduct of the defendants. We conclude that there was sufficient evidence on all issues involved to authorize a submission of those issues to the jury. The case was submitted to the jury on specific interrogatories which brought into sharp focus the fact issues to be decided. The jury clearly and repeatedly answered that by the exercise of reasonable diligence Pan Am could have ascertained the existence of fraud on the part of the defendants in all reasonable probability before the two year period next preceding the filing of the complaint. In deciding this case we are sitting as a Texas court. It is not within our province to approve or disapprove, or to refuse to apply the applicable rules of law because of the revolting and unsavory conduct of the defendants. We are bound by Texas law.[6]

Since the case was argued orally, Pan Am has filed a supplemental brief in which it contends that the defendants are estopped to make the defense that Pan Am could not rely on the defendants' fraudulent conduct, and from asserting that Pan Am was under a duty to make further inquiry. As Pan Am forthrightly asserts in its original brief, the myriad of cases on the subject of fraud present a vast labyrinth of decisions reaching varied results.[7] The cases cited

---

5. It should be noted that Section V of the pretrial order contains the following:

"Contested Fact Issues and Proposed Jury Issues.

"Submitted by Plaintiff:

"A. Whether plaintiff knew that one or both of defendants' wells were bottomed under and producing from its lease more than two years prior to filing suit.

"B. Whether any of defendants were guilty of acts of concealment designed to conceal the taking of plaintiff's oil.

"C. Whether plaintiff learned of facts, and when it learned same, putting it on inquiry to investigate to discover whether Orr Wells No. 1 and 2 were directionally drilled so as to be bottomed under plaintiff's lease.

"D. Whether plaintiff made a proper investigation using reasonable diligence, to discover whether the said wells were bottomed under its lease and producing oil therefrom.

"E. If plaintiff did not make a proper investigation, using reasonable diligence, then whether a proper investigation and the use of reasonable diligence would have discovered such facts."

6. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

7. "It is fundamental that limitation does not run where the cause of action has been fraudulently concealed by the defendant and is not discovered by plaintiff two years before suit by the use of reasonable diligence.

"Cases are found which on their face hold almost anything desired with reference to the extent of the duty of the plaintiff to investigate. Some say that there is no duty at all, others impose a duty which almost requires discovery. A closer analysis of these cases shows, however, that in most of them where the court says there is no duty to investigate because the injured party may rely upon the acts of fraudulent concealment, there has been nothing to put him on inquiry or suspicion, and the court indulges in the practical by recognizing that in business transactions a party does not have to investigate the truth of every statement made to him, but only those about which he has reason to suspect. In other cases, the court says that a partial investigation does not preclude the

by Pan Am in its supplemental brief deal largely with fact situations where the fraud involved induced the transaction complained about, and such fraud was an inherent ingredient of the transaction. The rules of law in the cases cited, under the facts in those cases, do not conflict with the rules herein set forth. Not all, but many of the cases cited in the supplemental brief deal with fraud in the sale or exchange of property, a fiduciary relationship, or fraudulent representations made to obtain the execution of a contract. Pan Am admits in its summary of the cited cases that an alleged fraudulent representation should not be relied on in circumstances where the representation itself causes suspicion.

While we have concluded not to undertake a cataloging of the evidence for the reasons hereinafter set out, it does seem appropriate to mention the fact that Pan Am relies very heavily on the directional survey made by Houston Oil Field Material Company (Homco), a reputable, reliable concern, not given to fraud. It is contended that there were no suspicious circumstances connected with the directional survey. Undoubtedly, the directional survey was an honest one. On the other hand, there are circumstances connected with it which clearly show that there were ample reasons to lead Pan Am

to the conclusion that it should not rely blindly on the survey. The survey in question was completed on June 17, 1957, which was 17 days before the well was completed on July 4, 1957. While Pan Am admits this lapse of time, it makes the following contention:

> "But it appeared that this much time might be required for such completion operations as running casing, cementing, shooting, squeezing, making connections, and a myriad of things, especially if a little trouble was encountered."

Apparently, Pan Am assumed that all drilling had been completed when the directional survey was made. As a matter of fact however, Railroad Commission Form 2 showed that *drilling* was commenced on June 12, 1957, and that *drilling* was completed on July 4, 1957. Of more importance is the letter of L. H. Carroll, a qualified geologist in the employ of Pan Am, dated August 1, 1957, directed to Pan Am a month and 13 days after the directional survey. This letter alone is sufficient to arouse suspicion and give Pan Am ample reason to know that it should not wholly rely on the directional survey, however honestly made. The letter will be set forth in the margin.[8] As will be seen from a reading of the letter, a number of suspicious cir-

---

possibility of reliance. A basic ingredient is whether the plaintiff was actually deceived by the fraudulent concealment; if not, and he learned the truth, of course the limitation period is not tolled. On the other hand, if he was lulled, limitation may be tolled, this whether the lulling prevented any investigation at all or caused him to curtail his investigation."

8.  "Tyler, Texas
August 1, 1957
"Re: Apparent Unjust Oil Drainage
Christian Woman's Board of
Missions Lease
Hawkins Field
Wood County, Texas
"Mr. Wm. J. Nolte
Pan American Petroleum
Corporation
Fort Worth, Texas
Dear Sir:
"The following information is submitted as requested relative to the unique sit-

uation on the east side of the Hawkins Field where production is being obtained by independent operators downdip east of earlier dry holes which delineated the edge of the field.

"We refer particularly to current production just east of our Christian Woman's Board of Missions Lease No. 32422 in the S. Castleberry Survey. The B. F. Phillips, a 330' direct east offset to our lease, found all the Woodbine sands carrying water as clearly shown on electric log and was abandoned in June 1942. In July 1948 B. B. Orr drilled a hole only 125' southeast and downdip from the above Phillips No. 1 Snider dry hole. He reported the total depth to be 4950' or practically the same subsea depth as the nearby dry hole. Oddly enough, Orr completed this hole for a flowing potential of 186 BOPD or ¼" chock, TP 180, CP sealed, Gravity 22 degrees. This well was reported to be perforated at

cumstances are outlined, but more important is the following statement:

> "We conclude that *all evidence* strongly indicates that the Orr well has been whipstocked to the west and probably is draining oil from Pan American's Lease No. 32422." (Emphasis supplied.)

Statutes of limitation are based upon sound policy considerations. Such policy considerations applicable in the State of Texas are to be determined by the Legislative Branch of the Government of that State. It may be true that every time a statute of limitations bars a meritorious cause of action a wrongdoer profits from his own wrong, but the statute applies to those who do right and those who do wrong with equal force. As pointed out by the Supreme Court in Pendergast v. United States, 317 U.S. 412, 418, 63 S.Ct. 268, 270–271, 87 L.Ed. 368 (1943):

> "Every statute of limitations, of course, may permit a rogue to escape."

Again the Supreme Court spoke on the subject in Chase Securities Corp. v. Donaldson, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945):

> "Statutes of limitations find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. (Citing authority) They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate." [9]

▆ This is a case where the evidence is voluminous and conflicting, but the applicable law is clear. The record on appeal contains almost 1,300 pages of evidence. A summary of it would extend this opinion to undue length and would

---

4756–4800' or subsea 4443–4487' which is considerably below this water level of about subsea 4410' in the area. Actually the entire Woodbine formation is below water level.

"No electric logs were released on any of these downdip wells with the exception of the dry B. F. Phillips well, which penetrated 258' of Woodbine with numerous sands all bearing water. No faulting is suspected nor indicated to be present in the immediate area.

"We are enclosing a shot of our field map showing location of all wells, completion data, and structure contours on Top of Woodbine formation. Also a photocopy of our scout ticket on the B. B. Orr well is included on which is recorded the statement that 'approximately 5120' of pipe was run' instead of the 4950' production string reported by operator. This is reported to be a "whipstock" hole.

"We conclude that all evidence strongly indicates that the Orr well has been whipstocked to the west and probably is draining oil from Pan American's Lease No. 32422. To January 1, 1957, the Orr No. 1 Snider had a cumulative production of 249,949 barrels of oil and produced 2,944 barrels of oil per month as of June 1, 1957.

"The Snider No. 1 Crossman well located in the extreme northwest corner of the G. N. Gray survey to the south is obviously a case similar to the Orr well. It is located 300' south and downdip from a dry hole, and is producing 2432 barrels of oil per month although situated downdip structurally from the Magnolia No. 6 Jarvis College which is depleted and abandoned due to water encroachment.

> "Very truly yours,
> L. H. Carroll"

9. For other cases discussing the subject see: Adams v. Woods, 6 U.S. (2 Cranch) 336, 342, 2 L.Ed. 297 (1804); Clementson v. Williams, 12 U.S. (8 Cranch) 72, 74, 3 L.Ed. 491 (1814); Kavanagh v. Noble, 332 U.S. 535, 538–539, 68 S.Ct. 235, 92 L.Ed. 150 (1947).

not accomplish any useful purpose. It is sufficient to say that a review of the record convinces us that the jury was amply supported by substantial evidence in deciding that the plaintiff did not meet the required standard of diligence. The evidence was in irreconcilable conflict, and such evidence clearly supports conflicting inferences and conclusions. In such circumstances, it is the function of the jury to make a choice. Our agreement with the verdict of the jury is not the test.[10]

Each case must stand or fall on its own facts. The conduct of those bent on fraud and motivated by evil and dishonest purposes is never exactly the same. We cannot match the fraud here with the fraud practiced in other cases; nor can we give such an effective outline of the fraudulent conduct here practiced as will serve as an evidentiary standard to guide courts, counselors or juries in comparing the fraud involved here with the conduct of others in other cases. Each case must be decided according to the applicable rules of law and the facts proven. The evidence of a lack of reasonable diligence on the part of a plaintiff who has been the victim of stealth, trickery, fraud and thievery should be proved by a preponderance of all the evidence in order to deny recovery to the plaintiff. The fact that the evidence is in conflict is not sufficient to authorize the trial court to take the case away from the jury. The function of the jury is to make a choice where the evidence is in conflict. In this case we cannot say as a matter of law that there was such a lack of relevant, substantial evidence as would cause reasonable minds to reject the conclusion drawn by the jury in this case that the plaintiff failed to exercise reasonable diligence.

The judgment is

Affirmed.

---

10. Atlantic Greyhound v. Crowder, 5 Cir., 177 F.2d 633; Travelers Insurance Company v. Truitt, 5 Cir., 280 F.2d 784; Royal Indemnity Co. v. Curtis, 5 Cir., 256 F.2d 329; Doggett v. Atlantic Holding Corporation, 4 Cir., 239 F.2d 156; Eastern States Petroleum Company v. Gilliland Refining Company, 5 Cir., 103 F.2d 186; City of Cardwell v. United States, 5 Cir., 186 F.2d 382; 7 Moore Federal Practice (2 Ed.) 3129, Section 73.07(3).

The function of the jury and the scope of our review are set forth in the following quotations:

(a) Doggett, supra:

"The very essence of its [the jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * That conclusion * * * cannot be ignored."

(b) Royal Indemnity, supra:

"It is sufficient to say that we will not disturb a jury's verdict if, as here, the evidence, viewed from the standpoint of the successful party, is sufficient to sustain the verdict, or if reasonable minds could differ as to the weight and probative force of the evidence."

(c) Travelers Ins. Co., supra:

"Our function as a reviewing court is the narrower one of determining whether there was any substantial evidence to support the verdict."