**W. G. ANDERSON et al., Appellants,**

**v.**

**CITY OF ALBANY et al., Appellees.**

**No. 20501.**

United States Court of Appeals
Fifth Circuit.

July 26, 1963.

Rehearing Denied Sept. 12, 1963.

# 650

D. L. Hollowell, Atlanta, Ga., C. B. King, Albany, Ga., Constance Baker Motley, New York City, for appellants.

H. G. Rawls, H. P. Burt, Albany, Ga., for appellees.

Before TUTTLE, Chief Judge, and RIVES and GEWIN, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal by the appellants, four Negro residents of the city of Albany, Georgia, officials of the so-called "Albany Movement," from an order of the trial court dismissing their complaint, which, as a class action, sought to enjoin the defendants from continuing to enforce certain alleged segregation practices with respect to publicly owned and operated facilities of the city and certain other privately owned, but publicly regulated, facilities. The complaint alleged that segregation of the races is enforced by police officers of the city of Albany in the public recreational, library, and auditorium facilities of the city and that through the existence of ordinances of the city of Albany, segregation of the

races is enforced in the privately owned transportation facilities, theatres and taxicabs. It is these practices which appellants sought to enjoin by their suit.[1]

After extended hearings conducted by the trial court on three separate occasions, the court held that the four named plaintiffs did not represent the class on whose behalf they brought suit, because the record did not disclose that they individually had ever been denied access to the public facilities in suit or had been compelled to use them on a segregated basis. The court thereupon held that they could not recover on their own behalf because they had not shown such denial to themselves individually and could not recover on behalf of the class because they had not shown that they were members of the class. On a careful review of all of the evidence in light of the decided cases both by this Court and the Supreme Court, we conclude that the trial court erred in dismissing the complaint and in failing to grant the injunction sought.

Much of the record was consumed by what appears to have been an effort on behalf of the defendants to prove, first, that no demand had been made by the appellants for an end to the policies about which they complained, and, second, that, in fact, the policies of racial segregation about which hundreds of Negro citizens of Albany protested, and in connection with which protests they were frequently arrested, really did not exist at all. The fact is that several times during the course of the trial the Mayor of the City of Albany stated that a demand touching on these racial policies of the city had been made to him as the representative of the City Commission, and that any

---

1. Specifically, plaintiffs prayed that the defendants be restrained and enjoined "(1) From an alleged enforcement of racial segregation in publicly owned and operated libraries, in the publicly owned and operated auditorium, in publicly owned and operated parks and playgrounds, and the recreational facilities thereof, in privately owned and operated buses and depots, in privately owned and operated taxicabs, in privately owned and operated theatres and other places of public amusement; and (2) From threatening to arrest, arresting and harassing Plaintiffs and members of their class for utilizing or attempting to utilize public parks, libraries, buses, bus depots, train stations, taxicabs, theatres and other places of amusement claimed by Plaintiffs to be presently limited to white persons by reason of Defendants' segregation policies and ordinances."

change in the policy had been declined by him representing the Commission. Moreover, with respect to each of the facilities mentioned in the complaint, there was undisputed evidence, usually given by the defendants themselves, to the effect that the policies of segregation were then in effect so far as relates to the public facilities, and were required by City Ordinance, whether or not enforced by the defendants, with respect to the regulated private businesses.

■ First, with reference to whether the appellants, or any of them, had themselves been aggrieved by the segregation policies of the city of Albany, (assuming for the moment that such policies did exist) in response to the question, "When was the first time you ever received a communication or gained any knowledge of the existence of the Albany Movement?", Mayor Kelly answered as follows: "That's rather difficult to answer, in that I don't recall when the organization was first identified as the Albany Movement. I do recall that Dr. Anderson, and I believe Marion Page, and I think C. B. King, and perhaps Slater King (both Dr. Anderson and Slater King are plaintiffs in this suit), I'm not sure, came to see me as early as February, 1961, to discuss the feelings of certain members of the Negro community; *and I believe presented at that time a request to be submitted to the City Commission; which, in substance if I recall correctly, sought complete desegregation of all public facilities*, but I am not clear as to exactly what the demand was at that time. At that time I indicated to Dr. Anderson and to the others present that in my judgment the proper forum for the relief they sought was in the Federal Court (Emphasis Added)."

Later, in response to a further question, Mayor Kelly testified that exhibit 7 [2] was presented to him but he did not recall whether it was at a meeting or whether it was delivered "to us." Then the following testimony took place:

"A. I recall seeing this, yes.

"Q. And that is the matter or document which you say requested desegregation of public facilities?

"A. This is one of the documents which requests desegregation of all public facilities, yes.

"Q. What action has been taken on that petition?

"A. It was presented to the City Commission. It was the feeling of the City Commission that the request embraced too much, based on the long-term customs of this area, that it was not feasible at this time to consider complete desegregation; and that the Albany Movement or the people representing the Albany Movement should properly resort to the Federal Courts for redress."

There is no real dispute here but that literally thousands of people in the city of Albany associated themselves in the activities that all parties to this suit in the trial court repeatedly called the "Albany Movement." Possibly the clearest indication of this is in a reply published *by the City Commission* in one of the local newspapers purporting to be an answer to the requests made by the Movement as above indicated. This reply is addressed "To the Leaders of the Albany Movement." The reply did not deal with any of the specific requests contained in the petition quoted above, but called attention to the progress which had been made by the Negro citizens. It included the following paragraph:

"This Commission recognizes that the community is composed of white and Negro citizens, and that peace

2. This exhibit was in the form of the Minutes of a meeting of the Albany Movement dated November 17, 1961, the first page of which was as follows:

*"THE ALBANY MOVEMENT*
                                November 17, 1961
Minutes:
Opening remarks were made by Dr. W. G. Anderson concerning objectives and co-

and harmony must exist and endure. The achievement of these goals, however, does not lie in the flagrant violation of laws and ordinances, and the profane use of the church, the ministry and religion for the furtherance of political objectives."

The following ten paragraphs all speak of benefits enjoyed by Negroes *as a class* within the city of Albany or the responsibilities of Negroes *as a class* and ended with the statement, "If the Negro leaders of Albany have a sincere desire to help earn acceptance for their people, they can accomplish far more by encouraging the improvement of their moral and ethical standards." It is thus plain that not only did the plaintiffs here, both as the elected representatives of the unincorporated association called "The Albany Movement" and also, the recognized leaders of the Negro community, truly represent the Negro citizenship of the city of Albany in the demands that were being made upon the City government. We conclude, therefore, that there is no factual dispute but that the four plaintiffs were members of a class whose interests were the basis of demands made by them on the defendants and which the evidence clearly shows were rejected.

Assuming, as we do for the purpose of testing the action of the trial court here, that in order for there to be a justiciable controversy there must be a demand that there be an end to the racially discriminatory practices made by the class or some members of the class of which the named plaintiffs are members, there can be no doubt in the light of the testimony of the Mayor of the City of Albany that such demand was, in fact, made by at least two of the plaintiffs in this suit. Moreover, the record is replete with testimony that over an extended period constant picketing and demonstrations carried on by these named plaintiffs and many others repeatedly made the same demands on the city officials, who reacted uniformly by arresting these plaintiffs and many others while thus engaged.[3]

■ There is nothing in Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512, that requires a particular plaintiff in such a proceeding as this to

---

ordination of efforts towards the breaking down of segregation. Also the necessary preparations for bonding facilities. This was followed by the naming of temporary officers: Anderson, Chairman and Page, Secretary.

Open discussion followed with reference to methods to be employed in achieving desegregation.

PRINCIPAL TARGETS (in the order of their appearance) FOLLOW:

1. Bus Station
2. Train Station
3. Library
4. Parks
5. Hospitals
6. City Buses — NUMBERS 3 to 6 inclusions to be combined as municipal facilities
7. Police Brutality
8. Municipal employment to be sought in all areas with emphasis and priority on the police force and utilities.
9. Jury representation.
10. Job opportunities in privately owned facilities catering to negro trade.

Permanent officers were next named, with the previously named temporary officers being given tenure of office. These officers were named, along with Slater H. King, to serve as a committee to meet with the Mayor and his aides in an attempt to negotiate the issues previously listed. A recording secretary, to transcribe the negotiations on the spot, was also authorized.

Next meeting to be held Tuesday November 21 at 604 Mercer.

W. G. Anderson, Chairman
M. S. Page, Secretary."

3. Other litigation between these same parties seeks a determination of the issue whether such arrests should be enjoined as interfering with the appellants' First Amendment rights under the Federal Constitution. For the purpose of this opinion, this issue need not be resolved. It is plain, however, that, whether the arrests were legal or illegal, the City was amply put on notice of the repeated demands of the class represented by the appellants that there be an end to the policies of segregation with respect to those matters over which the defendants had control.

subject himself to arrest before he can attack the municipal or state policy of continued enforcement of segregation in public facilities. In fact that decision recognized the very right which the plaintiffs here sought to assert on behalf of the class. The Court's statement there that "they cannot represent a class of whom they are not a part," related only to the effort by the named plaintiffs who had not been arrested or prosecuted to enjoin actual prosecutions in the state courts of hundreds of Negro citizens who had actually been arrested, many of whom had been tried and convicted. They were not members of that class— they were, however, members of the class of Negro citizens who were adversely affected by the State's policy of racial segregation. There is no requirement, as we have stated in Morrison v. Davis, et al., 5 Cir., 252 F.2d 102, at page 103:

> "[T]o have incidents requiring arrests to have the rights of people declared."

Thus it need not be shown that these individual plaintiffs actually subjected themselves to arrest in order to bring this action. The Supreme Court dealt with just such a situation in the case of Evers v. Dwyer, 358 U.S. 202, at page 204, 79 S.Ct. 178, at page 179, 3 L.Ed.2d 222, where, dealing with the right of a Negro to attack the validity of City Ordinances requiring segregated buses, the Court said:

> "A resident of the municipality who cannot use transportation facilities therein without being subjected by statute to special disabilities necessarily has, we think, a substantial, immediate, and real interest in the validity of the statute which imposes the disability."

It takes but little paraphrasing to apply this test to any publicly supported facilities of the city of Albany, and none at all, we think, to apply it to the bus, taxicab, and theatre ordinances in Albany which required that they be operated on a racially segregated basis. We hold, therefore, that it was error for the trial court to dismiss the complaint as not properly presenting a justiciable class action for the Court's determination.

We next turn to a determination of the relief that should be accorded the appellants in the present posture of the case.

The suit seeking a preliminary injunction and a permanent injunction was filed on July 25, 1962. It was finally set down for hearing by the trial court and submitted on the evidence on September 26, 1962. This was the first opportunity afforded the appellants for a full hearing on their motion for preliminary injunction. The trial court took the matter under advisement for more than four months and entered its order dismissing the complaint on February 14, 1963. A subsequent clarifying order was entered on March 15, 1963. After filing notice of appeal and perfecting the record, the appellants filed a motion in this Court for an injunction pending appeal, or, in the alternative, that the hearing of the case on the merits be accelerated. The latter action was taken and the case was set down for final hearing on the merits in this Court. Our reading of the record so clearly convinces us that, upon application of the proper legal principles, the trial court was without discretion to deny the injunction sought that we think it appropriate to direct that upon remand an injunction issue substantially as prayed.

■ We deal first with the facilities owned and operated by the city of Albany. These are the public parks, including the recreational facilities, such as tennis courts and swimming pools, the City library, known as the Carnegie Library, and the City auditorium. While there is much testimony in the record by which the City sought to make it appear that in fact the City swimming pools and tennis courts were not operated on a racially segregated basis, there can be no real dispute but that they are and have been so operated. In fact at the date of trial the Mayor testified that the swimming pools had been closed, clearly because, as he testified, he felt that it was

impracticable to operate the swimming pool on a racially desegregated basis. Equally, it was clear that until after the time of the trial, the Carnegie Library, used until then exclusively by white patrons, was racially segregated. A trustee of the Library Board, having testified that the custom of segregation was in effect, was asked whether it was dictated by the Board of Trustees. He answered, "That would be hard for me to answer specifically. When I was appointed to the Board, that custom was in force. It has been in force since that time. That's all I can say." Then the following questions and answers occurred:

"Q. This custom has been in force by the Board of Trustees?

"A. That is correct.

"Q. Of the Carnegie Library?

"A. Yes.

"Q. And, as a matter of fact, it presently is being enforced. Is that correct?

"A. Yes, except the Library is not open, as you know. Neither the downtown branch nor the the Lee Street (Negro) branch.

"Q. Then up until such time it was closed it was maintained?

"A. That is correct.

"Q. Now, as regards to this information that you bring Mr. Robinson, with reference to status, the present status of the library, whose decision was it that these libraries would be closed?

"A. As a matter of personal knowledge I can't say, they were closed on the week end I happened to be out of the City. I have subsequently learned that they were closed by police action."

Coming next to the City Auditorium, which is made the subject of one of the contentions in the complaint, it is not disputed that Dr. Anderson, one of the plaintiffs, had on at least four occasions, been required to sit in the auditorium according to a pattern of segregated seating. While the evidence is not clear as to the nature of some of the occasions, he testified that at least on one occasion he was attending a program open to the public. It is clear that he was thus not attempting to patronize it on an occasion when the auditorium had been leased or otherwise turned over to a private organization for a non-public use. While there is no City Ordinance requiring segregated seating in the City Auditorium, it was owned by the City and we think the record clearly shows that the practice and custom carried out by the City required such seating.

Since the Supreme Court affirmed the Fourth Circuit case of Dawson v. Mayor of the City of Baltimore, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774, affirming 220 F.2d 386, it has been "obvious that racial segregation in recreational activities can no longer be sustained as a proper exercise of the police power of the State." For similar cases arising in this Circuit, see Holmes v. City of Atlanta, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776; Tate v. Department of Conservation and Development, 352 U.S. 838, 77 S.Ct. 58, 1 L.Ed.2d 56; City of St. Petersburg v. Alsup, 5 Cir., 238 F.2d 830. See also as to a public library, Turner v. Randolph, 195 F.Supp. 677 (W.D.Tenn.1961), Cobb v. Montgomery Library Bd., 207 F.Supp. 880, (M.D.Ala.1962). As to a City Auditorium, see Flowers v. City of Memphis, Civ.No. 3958 (W.D.Tenn. July 11, 1962).

We next come to a consideration of the contention of the appellants that the trial court should have enjoined the City from enforcing its ordinances requiring City buses to maintain separate seating for white and Negro passengers, requiring taxicabs to carry either white or colored passengers, and to indicate by a sign on the outside of the cab which class was to be carried, and requiring white and colored patrons of theatres and other places of amusement to stand in

separate lines for the purchase of tickets.[4]

During the trial the Chief of Police and other officials of the city of Albany testified that they did not enforce these ordinances. However, there was ample evidence to the effect that persons who violated the ordinances had been subjected to arrest or other restrictions brought about solely by reason of the fact that their conduct ran counter to the conduct prescribed by the ordinance. For instance, it was proved that a Negro taxicab driver had been arrested and charged with disorderly conduct shortly before the trial when his only "disorderly" conduct was that he had carried two white service men at their request and without charge into the city limits from an adjoining military base. It was further testified that a white taxicab had refused to carry Negro passengers and announced that this refusal was based upon the policy that white cabs would not carry Negroes. It was undisputed that a young Negro woman, upon sitting on the front seat of a bus of the local bus company had been instructed by the driver that she should take a seat to the rear of the bus the next time she rode. She was also arrested but it was disputed as to whether her subsequent conduct entirely apart from the place of her seating warranted her conviction for breach of the peace. It was also undisputed that a Negro girl had been required to move to segregated seating within a theater and had been required to buy a ticket in a segregated line and that upon her appearing in the office of the manager to discuss the desegregation of the theater, she had been taken by the Chief of Police to the City Hall where he called the principal of her school and turned her over to the principal.

We think it clear that under these circumstances the principle announced in Peterson, et al. v. City of Greenville, 83 S.Ct. 1119, requires that an injunction forbidding the enforcement of these city ordinances, either directly or by treating a violation of them without more, as a breach of the peace or as a refusal to obey the orders of a police officer, is required.

As stated by the Supreme Court in the Peterson case, "It cannot be denied that here the City of Greenville, an agency of the State, has provided by its ordinance that the decision as to whether a restaurant facility is to be operated on a desegregated basis is to be reserved to it. When the State has commanded a particular result it has saved to itself the power to determine that result and thereby 'to a significant extent' has 'become involved' in, and in fact, has removed that decision from the sphere of private choice. It has thus effectively determined that a person owning, managing or controlling an eating place is left with no choice of its own but must segregate its white and Negro patrons. The Kress management, in deciding to exclude Negroes, did precisely

4. In an ordinance passed by the city of Albany on August 11, 1942, and still standing unrepealed at the date of the trial, it was required by Section 1 that all passengers of buses operated in the city of Albany should provide separate accommodations for white people and Negroes; it imposed on all conductors, drivers or other employees in charge of said bus or buses to assign all passengers to their respective seats so as to separate the white and Negro races. Section 2 of this ordinance provided that white and colored passengers should not be carried at the same time in any taxicab for hire in the city of Albany. Section 3 of the ordinance required that any person selling or otherwise disposing of tickets for admission to any theater or place of amusement should have separate places for the sale of said tickets to white and Negro persons. Section 4 made it unlawful for a white person to remain in a line or group formed of colored persons or vice versa for the procuring of tickets. Section 5 of the ordinance made it a criminal offense for any person to violate any of the provisions of the previous sections of the ordinance.

An ordinance adopted on August 27, 1946 required that every vehicle licensed to carry white passengers as a taxicab should have a sign plainly painted on each side showing the words "For White" and every vehicle licensed to carry colored passengers should have a sign bearing the words "For Colored." Violation of this provision was also made a crime.

what the city law required." This language is clearly applicable to the Albany situation.

■ Finally, complaint is made of the fact that the City has arrested Negro patrons for seeking to use the previously white facilities at the interstate and intrastate bus terminal in the city of Albany. In fact, it appears from the record before us that much of the picketing and demonstrations that followed in Albany stemmed originally from the failure of the city of Albany to recognize the validity of the Interstate Commerce Commission orders made effective in November, 1961, forbidding segregated ticket, waiting room, eating or other facilities in railroad or bus stations serving interstate transportation. It is clear that disorderly conduct charges were made against Negroes whose "disorderly" conduct was that they sought to make use of the bus station's white eating facilities. The repeated denial by the city officials that this was not being done was couched in terms of the city's not enforcing its segregation statutes. The denials are not consistent with the actual facts as testified to by the Chief of Police. These facts make it clear that a number of persons had been arrested merely because they were present in the bus station's areas formerly reserved for white persons, and other persons, principally white, were gathering in numbers sufficiently large to cause what the Chief of Police considered a threat of disorderly conduct. He testified clearly that all the arrested Negroes were doing was "walking and sitting in this area which was made up of both white and Negro." He testified that they did not use profane language,

they did not strike anybody, they were normally dressed, they did not make any unusual noise and did not insult anybody. Moreover, it appears that as recently as July 1962, shortly before the hearing, he arrested several Negroes who sought to use the eating facilities at the Trailways Bus Station, and were charged by the manager with trespass.[5]

This conduct, of course, also brings the enforcement of the trespass law as to the bus station clearly within the principle of the Peterson case, because the Chief of Police testified that there was a local ordinance requiring segregated eating facilities.[6]

The arrest of persons at the request of the manager of the bus station lunch room, therefore, clearly falls afoul the proscription announced in the Peterson case.

■ In affidavits filed in this Court pending appeal, the appellees undertake to show the following changes in the factual situation with respect to the matters in controversy:

(1) All of the segregation ordinances of the City of Albany have been repealed effective March 6, 1963.

(2) By City Ordinance the large white swimming pool has been offered for sale to the highest bidder, and bids have been received under which an offer has been made for the purchase of the said swimming pool; the Negro swimming pool is closed by order of the appellees.

(3) The main, or "white," public library in downtown Albany and the "Negro" branch have been opened as of March 11, 1963, without regard to color.

---

5. This testimony is as follows:
   "Your Honor, my officers arrived on the scene, namely Assistant Chief Lairsey, who instructed the owner or proprietor of this business that we had no right to take these people out of this restaurant because of their color; that if he asked them to leave, he had the right to refuse them and if he wished to take warrants, then it could be done. And upon this, he said 'I will take warrants, that I want to take warrants now.' The officers put the people in their custody and also taken

the manager or proprietor of this business at the same time to the City Hall, where they were held while the man taken warrant and brought the warrant back, and the warrant was served on them for trespassing under the State law."

6. This ordinance, adopted on January 24, 1956, prescribed that it should be unlawful for any person to operate a restaurant for colored and white persons or for colored and white persons to be served in the same room.

The appellees here urge that the case has become moot by reason of these facts. So far as relates to the closing of the recreational facilities, this contention has been clearly answered by this Court in City of Montgomery, Alabama v. Gilmore, 5 Cir., 277 F.2d 364, where we said:

"The appellants' contention that the ordinance and the policy or custom of enforced racial segregation became moot when the City closed its parks is completely answered in the opinion of the district court and in the cases there cited." [7]

As stated by Judge Bell of this Court, in his order denying emergency relief pending appeal in this case, it is proposed that the City of Albany sell its recreational facilities, or some of them, to purchasers who have already announced that they will be operated on a racially segregated basis. As a result, appellants have heretofore requested this Court to enjoin such sale on the ground that this would be a continued operation by the city and thus be state action which should be enjoined in this pending proceeding. We do not consider that the factual situation dealing with this sale has been sufficiently disclosed to enable us to decide this issue. It is still open for inquiry by the trial court in light of our decision in this case.

However, it is plain that the mere voluntary closing of the facilities after the filing of the instant suit cannot make moot the petition of the appellants seeking a permanent injunction against further conduct by the respondents which, at the time the suit was filed, was being engaged in by them.

The same principle applies to the repeal of the segregation ordinances long after the suit was filed and the matter submitted to the trial court. The passage of City Ordinances is a matter of regular action by the Commission of the City of Albany. What has been adopted can be repealed, and what has been repealed can be re-adopted. We conclude, therefore, that the plaintiffs are entitled to have their injunction against state action depriving them of their constitutional rights, based on the record at the time the case was tried.

■■ At the time of the dismissal by the trial court of this proceeding, there was also pending before that court a suit filed by the appellants for an injunction against the same defendants, or at least a part of them, seeking to enjoin the officials of the city of Albany from arresting Negro citizens of Albany for conduct which the plaintiffs asserted to be a legal exercise of their rights under the First Amendment to the United States Constitution to demonstrate and petition against city policies. Evidence was taken by the trial court dealing with the many arrests that were made by the city officials of named plaintiffs and other Negroes. Such arrests were usually made for a failure to secure a permit to conduct a parade, for disorderly conduct, for blocking traffic or some similar charge. While it is plain, and it is not denied by the appellees here, that prosecutions under the guise of constitutionally worded statutes and ordinances may not be used to deprive persons of the right to do what the Constitution permits,[8] the degree to which peaceful protest may be subject to restrictions for the safety or convenience of the general public poses a difficult question which must necessarily be dependent upon the facts of the particular case. The United States Supreme Court has dealt with such a situation in Edwards v. South

---

7. The District Court's opinion is found in 176 F.Supp. 776.

8. Not only does the Federal Constitution make such conduct inadmissible, but significantly the Georgia Constitution deals with the same subject matter. Article I,

§ 1 paragraph XXIV of the Georgia Constitution provides:

"Right to assemble and petition. The people have the right to assemble peaceably for their common good and to apply to those vested with powers of government for redress of grievances by petition or remonstrance."

Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 and Fields v. South Carolina, 372 U.S. 522, 83 S.Ct. 887, 9 L.Ed. 2d 965.

In view of the fact that the trial court has not made any findings of fact dealing with the particular incidents of arrest, and thus, of course, has made no application of the legal principles to the facts, we think it inappropriate for us at this time to undertake to deal with the appellants' claim for injunctive relief that has been made in the other suit. The trial court consolidated the cases for the purpose of permitting the testimony to be considered in both of them and we have thus considered testimony given in both cases. We need not consider whether the cases have been so consolidated as to permit our granting the relief in the other suit, which specifically sought this injunction. Proper judicial administration requires that this matter be first passed upon by the trial court. In light of our decision in the case here before us and the legal principles disposed of, we think it appropriate to say that appellants are entitled to a prompt decision on this matter at the hands of the trial court.

The judgment of the trial court is reversed and the case remanded with directions that an injunction issue consistent with this opinion.

Having accelerated the disposition of this case by reason of the fact that deprivation of constitutional rights is continuing, we consider it appropriate to, and do, direct that the mandate of this Court issue forthwith.

GEWIN, Circuit Judge (dissenting).

For the reasons hereinafter stated I cannot agree with my Brothers in this case. As I have tried to say in the past, and may say again in the future, people on both sides of the troublesome social problems that now seem imminent everywhere must realize, before it is too late, that neither side is entirely right nor entirely wrong. Complaints are justifiable both ways. There is too much unrestrained conduct; misplaced confidence in violence and the use of the sword; excessive and demanding impatience for overnight change; unreasonable obstinacy in refusing to yield on any point whatever; over-emphasis on the negative and "the wrongs of society", with little or no thought of the good that is inherent in all people. Neither street demonstrations resulting in violence and hatred, nor the decrees of a court can calm the emotions of those on either side of any question, so long as those emotions are prompted and kept alive by a blind hate that refuses to see the good in others, or wrongs that do actually exist. It is not too late for good citizens, regardless of color, to begin to emphasize those rules of conduct which result in good manners, courtesy, and a reasonable consideration of rights and wrongs; and bring into sharp focus the good conscience that is common to most patriotic American citizens. It is not too late, I say, but time is running out. When all the demonstrations, mob actions and violence in the streets have ended; and when all of the court decrees have been rendered, the problem will not have been solved; and it will not be solved until the people themselves, in a spirit of good will, undertake a solution. The price we pay for hate, prejudice, obstinacy and violence is too high. They are worth nothing, and *any price* paid for those unlawful and distasteful elements is too much. We must all realize that democracy is not a grab bag where the strong and swift are entitled to the most. So long as we continue to protect and nurture the tree of turbulence, we must eat its strange and bitter fruit. This is not intended to be a preachment or the assertion of a new idea, but an earnest plea to embrace again with a more fervent spirit the ideals of courtesy, respect, the responsibilities of citizenship, justice, domestic tranquility, and the blessings of liberty so well known to all people of the United States. If we fail, the bloody and obstinate contest will continue.

There are several reasons why I must disagree with my Brothers of the majority: (1) the opinion is contrary to the established law relating to class actions; (2) the presumption in favor of the findings of fact by the trial court has been disregarded, the clearly erroneous rule has not been followed, and the majority has made a choice of facts from a large volume of testimony where the facts are in conflict; (3) the rules of law with respect to the granting of injunctions have not been followed; and (4) the case is moot.

The trial court refused to issue an injunction in this case, because it stated that upon an examination of all of the testimony (1338 pages of testimony and 65 exhibits):

> "There is a complete lack of evidence sufficient to sustain a contention that any one or more of the plaintiffs have been denied the use of any of the facilities referred to in their complaint because of their race or for any other reason, nor that when using such facilities that they have been compelled to use them on a segregated basis."

It is fundamental that the plaintiffs cannot enforce Fourteenth Amendment rights for others in a class action if they have failed to prove that any of their rights as individuals have been denied. Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512; McCabe v. Atchison T. & S. F. Ry. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; Brown v. Board of Trustees, C.A. 5th, 187 F.2d 20; Kansas City, Mo., et al. v. Williams, et al., C.A. 8th, 205 F.2d 47; Clark v. Thompson, 206 F.Supp. 539 (D.C.S.D.Miss. 1962) aff'd 5 Cir. 1963, 313 F.2d 637.

All courts recognize the fundamental principle laid down in F.R.Civ.P. 52(a) that findings by a trier of facts will not be disturbed unless clearly erroneous. Thomas v. CIR, 5 Cir., 135 F.2d 378; Cedillo v. Standard Oil Co., 5 Cir., 291 F.2d 246; Pan American Petroleum Corp. v. Orr, et al., 5 Cir. 1963, 319 F.2d 612; Moore, Federal Practice, 2d Ed. 8129 § 73.07(3); Vol. 2B Barron & Holtzoff, Federal Practice & Procedure, (Rev. Wright) § 1133, p. 524. The trial court found as follows:

> "We will next consider so much of the evidence as necessary to determine whether this is a proper class action. For the Plaintiffs to maintain this action under consideration it must appear that one or more of *them* had been denied the rights or suffered the injuries which they allege have been denied to and suffered by the class which they purport to represent. Upon examination of 1338 pages of testimony and 65 exhibits we find that there is a complete lack of evidence sufficient to sustain a contention that any one or more of *the Plaintiffs* have ever been denied the use of any of the facilities referred to in the complaint because of their race or for any other reason, nor that when using such facilities that *they* have been compelled to use them on a segregated basis. Nor is there any evidence that any one or more of *the Plaintiffs* have ever been arrested, threatened with arrest or harassed for utilizing or attempting to utilize the public parks, libraries, buses, bus depots, train stations, taxicabs, theatres and other places of public amusement in the City of Albany. There are four Plaintiffs. Two of them never testified concerning any matter during the course of the trial. The testimony of the two who did testify was deficient in the respect above indicated. The Court finds that the Plaintiffs have not been denied the rights nor suffered the injuries referred to in the complaint. This being so, the Plaintiffs lack standing to seek injunctive relief for others who may have been injured, because the Plaintiffs cannot represent a class of whom they are not a part." (Emphasis in the original)

In my opinion no one can examine the vast amount of testimony and the 65 exhibits involved and come to the conclusion

that the above quoted finding of the trial court is clearly erroneous.[1]

1. We will not undertake to point out all of the factual errors in the majority opinion, but cite 3 typical examples:

(a) The majority opinion gives the impression that the city authorities made mass arrests of Negroes solely because they were undertaking to peacefully protest segregation policies. The following quotations from the evidence show that this is not the case:

"Q. Do you know whether or not any of your police equipment and cars have received any injury?

"A. Yes, we've had cars damaged to the extent of their beacon light, their red signal lights on top were smashed; bricks throwed against the sides of the cars, while they were observing these meetings.

"Q. Did anything ever happen to your paddy-wagon?

"A. Yes, during one of these meetings which was held at Kolkee Church, Third Klokie, which is located in the south part of town, the paddy-wagon's mirror was splashed by gun-shot and the paddy-wagon was set on fire by groups of people while the officers were out trying to disperse the crowd.

 \*      \*      \*      \*      \*

"A. In conversation with Dr. W. G. Anderson, he informed me in December prior to one of these marches, prior to the last march I think, when he was arrested along with Dr. Martin Luther King and Dr. Ralph Abernathy, in a conversation with me by phone, that they would not abide by our laws, that if those people were not turned out of jail and if their demands were not met by the City, that they would bring a thousand up here to the City; and my answer to him was, that if you intend to violate our City ordinances and our laws, the only thing I request of you is that you get in front of them and lead them.

 \*      \*      \*      \*      \*

"A. We had a group of 40 to come, of which 23 of those were juveniles, to march from the church. Larger groups come out of the church in the march but when they reached the intersection of Oglethorpe and Jackson, those people stayed on the corners and did not come across. These people were arrested for the same thing, and then in turn the crowds on the corner that night were in excess of 3- to 4,000 Negro people, which necessitated the use of every man that I had under my command, to enter Harlem to try to restore peace, at which time officers of my Department were

The main thrust of the complaint related to segregation in the public parks,

struck with bottles, officers of the State Patrol were struck with rocks, knocking out teeth, and at which time we had to disperse this crowd and move them back a block or block and a half away from there in order to relieve the tension and in order to prevent violence, more so than which we had had. The bottles were raining on us like mortar shells coming into the middle of the street, rocks and bottles. Our men were standing fast, giving voice commands. At no time was our sticks, our night sticks taken off of our belts. We tried our best to control this mob without violence on our part, to let them know the only thing we were there for was to see that the peace and quiet of the City and no violence was caused, and in return we were greeted with rocks and bottles, striking my officers and officers under my command.

 \*      \*      \*      \*      \*

"Q. During the marches in December, 1961, can you give us an estimate as to how long traffic was blocked, if it was blocked?

"A. On various marches, all of the marches, on the 12th I would say 2 hours or better; on the last march, which was on—that Dr. Martin Luther King and Dr. Abernathy and Dr. W. G. Anderson taken part in—it was probably from 6 o'clock until 10:00 or 11:00 before we returned to normal conditions in the City of Albany."

(b) The following statement relating to the use of the City Auditorium is from the majority opinion:

"\* \* \* the record clearly shows that the practice and custom *carried out by the City* required such (segregated) seating." (Emphasis added)

The following quotations from the evidence disprove the quoted assertion:

"Q. Now, let me ask you this: What is the racial policy of the City of Albany with respect to the use of that auditorium?

"A. There is no ordinance or resolution relative to segregation or integration at the auditorium.

"Q. Now, what is the custom with respect to seating in the auditorium of the City of Albany?

"A. The custom is determined by the person using the auditorium, the person or the organization using the auditorium. Frankly, I don't recall any use of the auditorium recently by the City itself. Now, it's used on many occasions by organizations. It's used on many oc-

libraries, buses, bus depots, train stations, taxicabs and theatres in the City of Albany. This case was originally docketed in this Court upon a motion of the appellants for an injunction pending appeal, but it was actually argued, submitted and heard on the merits. The motion for injunction pending appeal, however, brought before the court a number of affidavits relating to the status of the various public facilities mentioned in Albany, Georgia, at the time of oral argument. It is admitted that all ordinances of the City of Albany requiring segregation of the facilities mentioned have been repealed. It is unreasonable to justify the issuance of an injunction on the ground asserted by the majority to the effect that *repeal* of the ordinances constitutes proof that they may be re-enacted. There is no evidence in the record showing any intention on the part of the authorities in Albany, Georgia, to re-enact segregation ordinances. As stated by this court in Brown, supra:

"Such an injunction requiring detailed and continuous supervision over the conduct of a political subdivision is not congenial to equitable principles and practices and will not usually be granted."

Injunctions should be sparingly issued at all times; but greater caution and care should be exercised where political subdivisions are involved as pointed out

by this court in the Brown case. Trial courts traditionally have very broad discretion as to the granting of injunctions. See also Mack, Inc. v. General Motors Corp., 7 Cir. 1958, 260 F.2d 886; Miami Beach Fed. Savings & Loan Asso. v. Callender, 5 Cir. 1958, 256 F.2d 40.

Counsel for the appellants forthrightly admitted in oral argument that all of the ordinances relating to segregation had been repealed; that the library had been desegregated; that certain parks and swimming pool facilities which had heretofore been segregated, had been closed and sold; that the bus company about which complaint was made is out of business, but the ordinance requiring segregation on buses has been repealed; that no problem exists as to the bus depot or train station; and that ordinances relating to segregation in theatres and taxicabs have been repealed. The case of the City of Montgomery v. Gilmore, 5 Cir., 277 F.2d 364, cited by the majority, is no authority for the action taken by the majority in this case. In support of its position in citing the City of Montgomery case, the opinion of the District Court in the same case, 176 F.Supp. 776, is cited. By reference to that opinion, it will be seen that the ordinance there under attack had not been repealed. The parks had been closed subject to the determination of the City to open them at any moment while the segregation ordinance still remained the law of the City

casions by Negro as well as white groups and, of course, we turn down the use or applications for the use of the auditorium on occasions; but it's done, not on the basis of integregation or segregation, but it's because we think that the organization trying to use it would do more harm to the City than any possible good that could be served.

\* \* \* \* \*

"A. \* \* \* I asked the City Manager this morning, in the presence of one or two of the Commissioners, to refresh my recollection as to how a person goes about getting the use of the auditorium; and it was pointed out at that time that the organization or group using it determines whether it will be segregated or integrated, if that's what you mean?

"Q. In other words, the policy of the City is to let the lessee determine whether the affair will be segregated or integrated, is that it?

"A. I know of no policy of the City. That's been the practice that's been followed, yes."

(c) The opinion asserts that Negroes were arrested " \* \* \* merely because they were present in the bus station's areas formerly reserved for white persons." This assertion completely ignores the fact that a police officer had recently been killed by a Negro in the vicinity of the bus station. The temper of the people at this time and place did not tolerate delay for debate on the niceties of Constitutional law. Police officers had to act and act quick in order to avoid violence and bloodshed.

of Montgomery. Such is not the case here.

In my opinion, all of the issues raised on this appeal have now become moot. There is no evidence in the record which leads to a conclusion that there is any probability that such conditions will come about again. As pointed out by the Supreme Court in United States v. W. T. Grant Co., et al., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, in a case involving a different situation, the rule is as follows:

> "But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the *mere possibility* which serves to keep the case alive." (Emphasis added.)

The recent case of Clark v. Flory, 4 Cir. 1956, 237 F.2d 597, is directly in point. It was there held:

> " * * * in view of the fact that the park had been closed by act of the legislature, there was no basis for the issuance of an injunction with regard to its use. Under such circumstances, the case had become moot and its dismissal was proper."

As justification for requiring injunctive action, counsel for the appellants assert that the state has a duty to require private individuals who operate any type of facility used by the public to desegregate such facility by means of affirmative action on the part of the state. When asked by the court if such idea was a new one, counsel readily admitted that the idea is new; but referred to a New York statute which provides for a penalty to be imposed on private individuals who practice segregation. Even if such a statute could be considered constitutional, it is not the function of the courts to legislate. Voluntary segregation is legally permissible; and the law does not require compulsory integration.

Based on the facts now known to the court, and for the reasons stated, I would affirm the judgment of the lower court.