**CITY OF HOUSTON, Appellant,**

v.

**Troy D. ALLEN, Appellee.**

**No. 50.**

Court of Civil Appeals of Texas.

Tyler.

June 11, 1964.

Rehearing Denied July 9, 1964.

———◆———

John Wildenthal, Jr., City Atty., and Edgar Pfeil, Senior Asst. City Atty., Houston, for appellant.

Fermon Tom Walton and Harry Burns, Houston, for appellee.

SELLERS, Justice.

This is a personal injury suit in which Troy D. Allen, Appellee, was struck from the rear while waiting in his pickup truck with trailer attached to rear of same at a red light in the City of Houston. He was struck by one of the City of Houston garbage trucks, driven by one of its employees by the name of Marion Pusey. The issues were submitted to a jury and resulted in a judgment against the appellant in favor of appellee in the sum of $22,500.00. From this judgment the appellant has prosecuted this appeal.

The city complains of the judgment on the ground that there was no evidence to sustain the allegations of negligence relied upon by appellee; and if so, such findings are against the overwhelming weight and preponderances of the evidence. The city further complains that if there was any negligence on the part of the appellant it was in the exercise of a governmental function for which the city was not as a matter of law liable in damages.

The negligence relied upon by the appellee for recovery is that the city was negligent in failing to properly inspect and to adequately repair the brakes on the truck No. 1465 immediately prior to the collision and that such negligence was the proximate cause of the collision.

The city offers no evidence upon the trial of the case, and all issues submitted to the jury were found in favor of the appellee. The evidence relied upon by the appellee as supporting his right to recover are in the main as follows:

The City of Houston maintains its garage in the city for the repair of its many trucks which are operated by the city to collect garbage. In pursuance of such repairs, the city garage sent some three or four of its employees out to the dump grounds from the garage to make repairs as might be made to the trucks out there without having to bring them to the down-town garage. The dump grounds are some 14 miles from the down-town garage.

On the morning of December 28, 1959, Marion Pusey was assigned truck No. 1465, which was in the line of trucks ready for service on that day. As Pusey started to leave out in his truck, another employee advised him to be careful about the brakes as he had driven that truck about three days prior and had a wreck because of the brakes. This truck was an extra truck, used only one or two days a week. Pusey and his crew went out on their route and loaded its truck with garbage and about 11 o'clock started for the dump. His brakes during the morning began to slip, but he made it to the dump, as he was instructed to do by his foreman if he could, and to have his truck repaired there. At the time Pusey unloaded his truck at the dump, he noticed his brake pedal would go almost to the floor of the truck and would not hold. He then reported this condition to one of the mechanics at the dump and waited for the me-

chanic to make the necessary repairs. This the mechanic did, and Pusey took the truck out on the route for another load. During the afternoon the brakes on the truck were working in fair order. About 5 o'clock on the same day, Pusey, with a heavy load, started for the dump. When he approached the intersection where the collision occurred, he was driving at a speed of about 30 miles an hour; in fact, the city trucks have a governor on them which prevents the trucks being driven at a speed in excess of 30 miles an hour. Pusey could see the string of cars in front of him waiting for a red light. When he approached the intersection and applied the brakes, he felt that he had no brakes and that the foot pedal went all the way to the floor board and did not have any effect on the speed of the truck at all. Pusey said he hit appellee's trailer and truck rather than hit the oncoming cars to his left and to prevent going into a ditch on his right, that he hit the rear of the appellee's vehicle going at a speed of some 30 miles on hour. The force of the blow killed a cow which the appellee had in the trailer of the truck, knocked the appellee's son out of the pickup and almost knocked appellee from the truck. Appellee's truck was knocked into the car in front of him. The city truck had to be pulled in where repairs were made the next day.

■ While the foregoing is not all the evidence offered by the appellee, we believe such evidence is sufficient to sustain the trial court's ruling, that the evidence was sufficient to sustain the jury's findings of negligence, and that the city was not engaged in a governmental function.

It is seldom that we are able to cite a case in support of our holding on both the facts and the law by the Supreme Court as that of the City of Houston v. Shilling, 150 Tex. 387, 240 S.W.2d 1010, 26 A.L.R.2d 935. In this case a garbage truck of the City of Houston was involved under facts very similar to the facts in the case before this court, and the Supreme Court held the evidence sufficient to sustain the allegations of negligence, and that the city was not engaged in a governmental function.

■ The appellant challenges the sufficiency of the evidence to support the jury's verdict in the sum of $22,500.00. We take the following from appellee's brief, which we find fully supported in the statement of facts:

"Appellee was injured on December 28, 1958, and the trial began on July 15, 1963, more than three and a half years later.

"Appellee's wife of 25 years testified they were married at Henderson, Texas, up in East Texas, and he followed self-employed construction work all during their married life except for working in the shipyards during the war. During all their married life Appellee's health had been fine, he had never gotten hurt before and had never made any claim before; he had been in the hospital one time for a minor operation, but was a robust man. She was not present at the accident but went there after it was over and found her husband 'in pain and misery with his back and head'; she had to drive him home in her car. Before this accident Mr. Allen was supervisor and boss of his own workers, and he climbed up and down ladders and went on roofs getting estimates and never complained of any inability to climb. His physical quickness and agility in getting around were fine. Since the accident Mr. Allen cannot get up or get down, sometimes he can drive his truck but at other times she has to drive for him. He gets suffering spells once or twice a week when his head and back hurt him, and he just has to lie down on the floor almost out. Such spells last the rest of the week, and he hobbles around and walks with a limp.

"Appellee's son, David Allen, testified as to the force of the collision. It knocked him out of the pickup and on

the ground; the trailer was all bent up and the cow riding in the trailer was dying. It was a pretty hard blow. Since the accident Mr. Allen gets back aches and his neck gets stiff.

"Appellee, Troy D. Allen, testified he was 45 years of age, a large-sized man and was born and raised in East Texas. He went to the ninth grade in school and then started following the building trade, and had done physical work all his life. He got in the roofing and building business which he followed until the present; he had never made a claim for personal injuries before and this was his first time in court. Up to the time of this accident his general health has been good and he had not been to see any doctors or chiropractors except for cold shots. He was able to do full-time work at his business before this accident. The accident occurred around 5:00 P.M. on South Post Oak as he approached the South Main Street intersection. He had stopped behind a line of cars stopped for the traffic light. The accident was a hard lick, knocking his vehicle into the lady ahead of him and knocking his trailer up under his pickup truck; it knocked him about 30 feet with all his wheels sliding as he had set his brakes. He sat in the police car after the wreck when his head commenced hurting, he got dizzy, could not see and his head was just busting. Mrs. Allen drove him home, and he went to bed and got hurting so bad that he had to go to the clinic where Dr. Schiflett gave him some shots and pills. He did not go to work the next day, and it was five or six weeks before he could do anything. His head and back have hurt him from the time of the collision until the present but occassionally he is free of pain when he does not do any physical work whatsoever.

"Before the receipt of his injuries Mr. Allen's business was fair enough, he was buying new equipment to get larger, was expanding and had 16 or 17 employees. At the time of trial he only had nine employees and has had less since the accident; he could not get out to keep his work going so he had to lay off some workers, although a fire in 1960 or 1961 also hurt his business. His business now is about fifty to sixty-five per cent of what it was before he got hurt, according to his best estimate. Before his injury he ran his business fully and sometimes had to work with a crew when short-handed. He would climb ladders to roofs and make estimates, but since the accident he just sometimes makes the estimates, because if he climbed a ladder three or four times a day he cannot get out of bed the next day. During the immediate preceding two years prior to his accident his business was grossing between $150,000.00 and $175,000.00 per year; however, after then, his gross income has been much less and in 1962 it was around $60,000.00, but his 1961 fire destroyed his other records. The reason his 1959 income tax return showed a net loss was because he was buying a lot of equipment, sold some at a loss, and had depreciation.

"Appellee further testified that his general health is now bad as compared to before, and his head and back give him trouble, and he only attends to part of his duties compared to before. He is not a lazy type fellow and never lay around the house before, although he has to lie around a lot now. He has been to see numerous doctors and is still under a doctor's care. He now feels about 60 years of age whereas he felt like 20 before; he has hard hurting pain now in his back, his arms get numb, his head hurts and gets blurry; things he never had before the accident. He was 41 at the time of his injuries and had a life expectancy of approximately 30 years.

"Dr. John Kolaja, an educated, experienced and licensed general medical doctor was called by Appellee. He was the only medical expert to testify in the case. The doctor said that Appellee had been to the clinic before the accident on three occasions for treatment of bronchitis, a bad cold and a bruised knee but had never been there for back, neck or head trouble before the accident. He saw Mr. Allen on December 30, 1959, and got a history of the collision and of Mr. Allen's complaints. Mr. Allen had pain in the neck at the base of the skull, right shoulder and back, and he was tender in those areas; neurologically his reactions were a little bit slow. The x-rays showed him to have a loss of the normal 'S'-type curve in the neck and an increased calcification around the vertebra in the neck which indicated arthritic changes in the neck. A blow which jerks the body, head and neck is one of the common causes of the loss of the normal curvature such as Mr. Allen had. The blow received by him would not of itself bring about the arthritis, but it would aggravate his preexisting degenerative arthritis of the bones, which condition could then become painful to an individual who had not suffered any pain before. Other x-rays showed early arthritic changes in the lumbar vertebra. Dr. Kolaja's diagnosis was a moderate severe neck sprain and contusion of the muscles in the back, which condition would be painful. Mr. Allen's arthritis, as aggravated by the blow he received, would result in a diminished ability to work. This condition improves at times and permits a person to work some, then the condition increases and becomes disabling again, which is the way it works on Appellee. This disabling condition in Mr. Allen is a *permanent condition* in reasonable medical probability. The Appellee is still under Dr. Kolaja's treatment and care. The doctor could tell that his patient's complaints were justified by the muscle spasm and general motion of moving."

The evidence is believed to be in all respects sufficient to support the trial court's judgment in the amount of $22,500.00 in favor of appellee. Mikell et al. v. La Beth, Tex.Civ.App., 344 S.W.2d 702; Gilbert v. Haigler, Tex.Civ.App., 363 S.W.2d 337.

Finding no reversible error in the record, the judgment of the trial court is affirmed.