Jack GILBERT, Individually and d/b/a Gilbert Plumbing Company, Appellant,

v.

Gerald T. HAIGLER et al., Appellees.

No. 14046.

Court of Civil Appeals of Texas.

Houston.

Dec. 13, 1962.

Rehearing Denied Jan. 10, 1963.

**338**

Vinson, Elkins, Weems & Searls, Houston, and Sam W. Davis, Jr., Houston, of counsel, for appellant.

McClure & Lucas, Houston, and Harold Lloyd, Houston, of counsel, for appellee Gerald Haigler.

Richard H. Powell and George H. Vance, Houston, for appellees San Jacinto Glass Co. and Joe Walton.

WERLEIN, Justice.

This is an appeal by Jack Gilbert, d/b/a Gilbert Plumbing Company, from a $35,-000.00 judgment against him in favor of appellee, Gerald T. Haigler. Based on the jury verdict the court decreed that Haigler take nothing as against the defendants, San Jacinto Glass Company of Houston and Joe Walton, collectively referred to herein as Walton.

The evidence shows that about 8:30 o'clock a. m. the Haigler ½ ton truck, which had been traveling in a westerly direction in Houston on Old Spanish Trail, had come to a stop in the 1900 block thereof about 6 or 7 feet behind an automobile which in turn had stopped in a line of stopped vehicles. Walton testified that the truck of appellee San Jacinto Glass Company, driven by him, had made a normal stop about 10 feet behind the Haigler truck. About 20 to 30 seconds after the Walton truck had stopped Gilbert's Cadillac, without any warning, struck the Walton truck from the rear, driving it into the Haigler truck, which in turn struck the car in front of it.

All negligence and proximate cause issues with respect to Gilbert's failure to maintain a proper lookout, failure to properly apply his brakes, rate of speed, and failure to change his course to the right or left, were answered favorably to appellee.

To Special Issue No. 16, inquiring whether the vehicle driven by Walton was stopped immediately before any impact between the Walton vehicle and the Haigler vehicle, the jury answered, "It was stopped." The jury did not answer any issues with respect to negligent acts or omissions on the part of Walton, since such issues were conditioned upon a negative finding to Special Issue No. 16.

Appellant complains of the error of the trial court in keeping the jury from considering the special issues inquiring as to negligence on the part of Walton by conditioning such issues upon a negative finding to Special Issue No. 16. The issues condi-

tionally submitted inquired only as to negligence of Walton in connection with lookout, application of brakes, speed and alteration of the course of the Walton truck. The law is well established that a defendant is generally entitled to an affirmative submission of his defensive issues pleaded and raised by the evidence, and that a finding on issues submitted is not a finding on issues not submitted. Colorado & S. Ry. Co. v. Rowe, Tex.Com.App., 238 S.W. 908; Montrief & Montrief v. Bragg, Tex.Com.App., 2 S.W. 2d 276; Schuhmacher Co. v. Holcomb, 142 Tex. 332, 177 S.W.2d 951; 41–B Tex.Jur., p. 619, Trial, § 470.

■ Affirmative defensive issues, however, need be submitted only when there is some evidence raising such issues. Dallas Ry. & Terminal Co. v. Darden, Tex.Com. App.1931, 38 S.W.2d 777; Traders & General Ins. Co. v. Peterson, Tex.Civ.App., 87 S.W.2d 322, writ dism.; 41–B Tex.Jur., p. 624, Trial, § 472, and authorities cited.

We have carefully read the statement of facts in an effort to determine whether there is any evidence of probative force that required the unconditional submission of the affirmative defensive issues with respect to negligence on the part of Walton.

The evidence shows that there were 33 feet of skid marks made by Gilbert's Cadillac and 2 or 3 feet of skid marks made by Walton's truck. Gilbert did not know whether Walton's truck had hit Haigler's truck before he (Gilbert) ran into the rear of Walton's truck. He merely knew that the impact, when he struck the Walton truck, was hard and that he skidded before striking it, and that there was over $500.00 damage done to the Cadillac.

Walton testified unequivocally that at the time of the collision he had his feet on the clutch and brake of his truck; that he had come to a normal stop 10 feet behind Haigler and had been stopped there for about 30 seconds before the Gilbert Cadillac struck the rear of his truck with a hard impact, knocking his truck into Haigler's truck;

that his truck skidded some 3 or 4 feet, and that after the impact with Haigler's truck he was 2 feet from the rear thereof. He testified that Gilbert said the collision was all his (Gilbert's) fault, that he was looking down adjusting his heater. Walton also testified that he did not recollect anything like Haigler's truck bouncing back and striking his truck after Haigler's truck had struck the car in front of it.

The testimony of Mr. Matthews, who was riding with Walton at the time of the collision, corroborates the testimony of Walton. He said that the Walton truck had stopped and had been stopped for some 20 to 30 seconds before it was struck in the rear by the Gilbert car; that they had no warning whatever; and that the impact was severe. He further testified that the Walton truck was not knocked into the Haigler truck a second time and that there was only one collision therewith.

Sgt. Charles Bell testified that when he investigated the collision Haigler said his truck was struck only once from the rear and that Gilbert said the collision was all his fault. Police Officer James testified to the skid marks, and that Gilbert told him he was going 20 miles per hour and didn't have time to stop.

Clearly there is nothing in the testimony of Walton, Matthews or the police officers to raise an issue of any negligence on the part of Walton. Haigler testified there were two impacts but that he did not know whether he had one impact with the car in front of him or not, that he was not certain in what order it happened, and didn't know how it happened, and didn't know whether or not the Walton truck was knocked into him a second time, and that it was possible that on hitting the car in front of him his truck bounced back and hit the Walton truck. He testified also that he could not tell whether the Walton truck had stopped behind him prior to the collision. He stated that after he had been stopped for some 30 seconds or a minute he looked into his rear view mirror and saw a truck coming at him;

that he did not know how close or how many feet it was, but it was right before the truck hit him and he didn't have an opportunity to brace himself; that the Walton truck slammed into him and his head flew back and he hit the glass and then his truck struck the car in front of him and he felt his head go back and forward again; and that he was shaken up and dizzy and was trying to clear his head when he got out of his truck. This testimony is consistent with the testimony of the other witnesses and with Haigler's statement that there were two impacts and the evidence relative to a double whiplash injury.

On cross-examination Haigler testified that he only remembered he had two impacts and believed they were from the rear. It was then shown that in his deposition he had testified that he was hit from the back and then hit the car in front of him and then he was hit again from the rear. This he affirmed after his memory had been refreshed. Thus there was some evidence of probative force that Haigler's truck was hit twice from the rear.

██ Assuming that Haigler's truck was hit twice from the rear, there is still no evidence of any probative force as to any negligence on the part of Walton with respect to lookout, speed, application of his brakes or failure to change the course of his truck. Walton testified that he saw the Haigler truck when he was a block or two away from it; saw it come to a stop, and then he drove up and stopped 10 feet to the rear of it. There is no evidence that he was not keeping a proper lookout or that he did not stop as he said he did. There is no evidence sufficient to raise an issue with respect to speed or change of course. The uncontroverted testimony shows that he did apply his brakes. It is our conclusion, therefore, that there is no evidence that would support the submission of any issue with respect to the alleged negligent acts or omissions on the part of Walton. It is well established law in this State that negligence and proximate cause may be proven by circumstantial evidence, but there must be some evidence from which the jury might find negligence or any other issuable fact. Bock v. Fellman Dry Goods Co., Tex.Com.App.1919, 212 S.W. 635. The mere fact that a collision occurs does not without more evidence establish negligence or proximate cause. Firestone Tire & Rubber Co. v. Rhodes, Tex.Civ.App., 256 S.W.2d 448, 452.

██ The rule with respect to the unconditional submission of issues and the circumstances under which the rule is inapplicable is expressed in Western Wood Products Company v. Box, Tex.Civ.App., 248 S.W.2d 974, as follows:

"We recognize that generally the parties to a suit are entitled to have the issues presented by the pleadings submitted in an affirmative and unconditional way, but this is not the rule when the findings on other issues necessarily negative the defensive issues or where the evidence is insufficient to raise the defensive issue."

In the instant case an affirmative answer to Special Issue No. 16, that the Walton car was stopped before any impact between it and Haigler's truck, necessarily negatived negligence on the part of Walton prior to being struck by Gilbert, with respect to lookout, brakes, speed and change of course. No issues were requested or submitted with respect to following too close or proper control. Appellant's only exception to such issue serving as a basis for the conditional submission of issues as to Walton's negligence, was limited to preclusion of a consideration by the jury of negligence on the part of Walton following the collision between the Walton truck and Gilbert's Cadillac.

██ We find no evidence that would warrant submission of any issue as to negligence on the part of Walton after his truck was struck by the Gilbert Cadillac with such violence that it was knocked into the Haigler truck 10 feet away, knocking it

into a car 6 or 7 feet beyond. No issue was requested or submitted with respect thereto. The evidence shows that Walton did apply his brakes and skidded several feet. Apparently this is accounted for by the fact that he had his foot on the brake and probably applied it automatically after being struck in the rear by the Cadillac.

We find no merit in appellant's second and fourth points in which he contends that the court erred in refusing to permit him to show that Haigler had never claimed workmen's compensation benefits in impeachment of Haigler's testimony that he had not gone to the hospital because he had no money, and the contention that the court erred in allowing counsel for Walton to argue to the jury that they should not make Walton pay for the damages. There is nothing to show that Haigler was covered by Workmen's Compensation Insurance. There is no bill of exception in the record preserving any error in connection with jury argument. We overrule appellant's third point. The record does not reflect that any motion in limine with respect to Dr. David's testimony, was filed or acted upon by the court.

We have carefully considered all the evidence in an effort to determine whether or not the judgment of $35,000.00 awarded plaintiff is excessive. Haigler testified in substance that when the Gilbert car struck the rear of his truck the impact was severe, and that his head flew back and hit the glass and also hit the glass in front when his head moved forward; that the tail gate of his truck was bent up and his bumper was broken loose and hanging down, and the bed of his truck had been driven into the cab of his truck and there was other damage to his truck, and the oven which he was hauling on his truck had been smashed; that he was shaken up and dizzy though not unconscious; that he started hurting about noon and had a headache, and pain in his neck; that he went home about two o'clock having a severe headache and sharp pains in his neck; that the next day he saw Dr. David and continued to see him three or four times a month and sometimes as often as twice a week at various times; that he had pains in his neck, sharp pains running down his right arm, and headaches; that the pain in his right arm was like a knife sticking him, and sometimes the pain went farther down than his elbow; that he continued to see his doctor about once a month but had seen no improvment in his condition; that he had never been confined to the hospital; that no brace or traction had been applied and that he had no cuts; and that he was given heat treatments and medicine by his doctor.

He further testified that he was 29 years of age; that following the injury which was December 29, 1959, he had been able to do only light work; that he did no work in January, 1960 and very little physical work thereafter; that in February he made $60.00 or $70.00 in delivery service work and about $100.00 or $150.00 in March; that he could do no hard work or heavy work; that he started an appliance business in his home but did no heavy lifting since heavy work would aggravate his condition; that from April to December, 1960 he made about $1400.00; that he took medicine and saw the doctor about once a month; that he got sick a few times and had to quit and go home, and had to lie down at times and rest; that in 1961 he made about $800.00 in his appliance business, $1200.00 working for Campbell Service Co. and some $800.00 working for Manchester Terminal, such work not involving physical labor.

Dr. David testified in substance that Haigler had received a whiplash injury to his neck and that he was bothered with pain in his neck and referred pain in the right arm down to the elbow; that the x-ray showed that the normal lordotic curve of the cervical spine or forward curve was absent and had been replaced with a complete straight-up alignment with no forward curve; that the forward curve is characteristic of the cervical spine; that the absence of the lordotic curve was abnormal and was usually brought on by injury to the

neck as the result of spasm, rigidity and pain in the neck resulting in the muscle pulling backward toward the back of the neck; that appellee had a loss of grip indicating a nerve injury; that all the muscles on the right side of his neck were tense, painful and spastic, and all movements limited; that appellee had seen him some 25 times; that there was a nerve root pressure on the right side which was probably caused by scar tissue, and that Haigler would continue to have pain from such condition; that scar tissue had the tendency to grow and cause even more irritation; that appellee would have pain for a long, long time in the future and would require medical attention in the future which would amount to $100.00 per year; that he recommended future hospital treatment for at least three weeks in an attempt to alleviate the condition, but stated that this was a chronic case and that hospitalization would not do as much good now as it would have earlier.

The evidence shows that prior to his injury Haigler made approximately $6500.00 per year, whereas in the two years following his injury he made a total of about $4500.00, consisting of about $1800.00 in 1960 and in 1961 about $2750.00 gross. At the time of the trial which was two years after the accident, Haigler was still suffering from diminished earning capacity. He testified he couldn't lift any more in regular work because of pain, and that he did not feel that there had been any substantial improvement in his physical condition. Dr. David's diagnosis was whiplash injury to the neck, cervical strain with radiation of pain extending through the right upper extremity and numbness therein, and obliteration of the normal lordotic curve. His bill for services rendered was $350.00.

Dr. Lane, an orthopedic surgeon who was called to the stand by appellant, testified that on examining appellee on October 27, 1961, nearly two years after the date of injury, he found no evidence of any spasms of the neck muscles although appellee complained of tenderness upon pressure on his neck at the lower part of his thoracic spine; that there was no atrophy of the muscles of either arm; that all of appellee's reflexes were normal; and that there was nothing abnormal manifesting itself. When comparing an x-ray taken by Dr. David December 30, 1959, and appellant's x-ray taken in October, 1961, he testified that the former shows some straightening which would possibly be the result of muscle spasm. He further testified that if appellee has suffered pain in his neck for over a year it would indicate a fracture or ruptured disk. There was no testimony, however, by either of the doctors to the effect that there was either a ruptured disk or a fracture. Dr. Lane testified that the history given him by appellee was compatible with a neck sprain, and not incompatible with a whiplash type of injury.

Appellee's wife testified as to his complaints of pain and suffering in his arms and neck and his headaches, his inability to do what he formerly could do, his need of frequent rest periods, nervousness, inability to sleep at nights, and her almost daily application of heat and liniments to his back, neck and shoulders.

The determination of the amount of damages in a personal injury suit is primarily with the jury, although the jury verdict is subject to the supervision of the court whether such verdict is too large or too small. Kimbriel Produce Co. v. Webster, Tex.Civ.App., 185 S.W.2d 198, writ ref., w. m. In the present case there is evidence which would support a jury finding that appellee sustained a severe whiplash injury which has resulted in severe pain, almost continuous suffering and great loss in earnings and earning capacity, with the probability that such conditions will continue for a long, indefinite period in the future.

It is difficult to appraise another's pain and suffering. As stated in Port Terminal Railroad Association v. Noland, 1956, Tex.Civ.App., 288 S.W.2d 276, writ ref., n. r. e.:

"There is almost no yardstick which may be employed which will remove

the decision from the realm of pure subjective thinking. The only objective approach to the problem of which this Court is aware is that of comparing the award made with those which have been approved by other courts in comparable litigation."

Although the amount awarded appellee appears to be quite ample, we cannot say in light of all the evidence or upon comparison with awards made for similar injuries in other cases, that it is excessive, or that the amount found by the jury does not constitute fair and reasonable compensation for the injury sustained by appellee. There is nothing to show that the jury was moved by any improper considerations in assessing appellee's damages. Green v. Rudsenske, Tex.Civ.App., 320 S.W.2d 228; Dallas Transit Company v. Collier, Tex.Civ.App.1958, 317 S.W.2d 557.

The judgment of the Trial Court is affirmed.