STANDARD MOTOR COMPANY, Ltd.,
Appellant,

v.

Charles BLOOD, Appellee.

No. 14301.

Court of Civil Appeals of Texas.

Houston.

June 11, 1964.

Rehearing Denied July 9, 1964.

Fulbright, Crooker, Freeman, Bates & Jaworski, S. G. Kolius, Thomas A. Brown, Jr., Houston, for appellant.

Robert V. Light, Little Rock, Ark., W. W. Watkins, Curtiss Brown, W. James Kronzer, Houston, Hill, Brown, Kronzer, Abraham, Watkins & Steely, Houston, Smith, Williams, Friday & Bowen, Little Rock, Ark., of counsel, for appellee.

## COLEMAN, Justice.

This is a suit seeking damages for personal injuries. Appellee was injured while riding as a passenger in a new automobile purchased by the driver from a dealer in the State of Arkansas. Appellant, the manufacturer of Triumph automobiles, is domiciled in England. Appellee's contention that a defect in the car's braking system was a proximate cause of the accident was supported by the verdict of the jury and a judgment was rendered in his favor in the sum of $275,000.00.

Appellant tendered into evidence the opinion evidence of four Arkansas peace officers that just prior to the accident the vehicle in which appellee was riding was being operated at a speed of 85 miles per hour. On objection the trial court excluded this testimony. Three of these officers arrived at the scene within a few minutes after the accident. The accident happened while the car was being driven around a 90° curve on an unbanked two-lane concrete highway. Prior to the accident there had been a heavy rain, and, while the concrete was dry, the shoulders of the highway were muddy. Patrolman Beach testified that he found marks made by the car and followed them to the car. Briefly summarized, it is his testimony that just as the car went into the curve its right-hand wheels went off on the shoulder and left a rut for 39 feet with some indication of braking action by the left wheels remaining on the pavement. The car then got back on the pavement and heavy skid marks from all wheels twelve feet in length could be followed to a point where the car again went off the road and then skidded sideways in the mud for 84 feet where it apparently rolled over sideways and landed on its top. He testified that except for the damage to the top there was little apparent damage to the car.

Officer Beach testified that he had ten years experience as a police officer and five years as a State trooper and had received training and experience in investigating accidents. He testified that based on the facts he observed, the condition of the road and shoulder, the measurements, the damage to the car, and his training and experience, he had formed an opinion of the speed of the car. He also testified that he knew nothing about coefficients of friction, and couldn't work out the exact speed like Captain De Long could, but that his estimate was his personal opinion based on experience.

The testimony of the two local officers who assisted in the investigation was not significantly different from that given by Trooper Beach. Captain De Long visited the scene two days later with Trooper Beach and saw the marks left by the car. His testimony is properly preserved by bill of exception and reflects that he secured the officer's measurements and inspected the car. He testified that he had an opinion as to the

speed of the car, but that it was not one he would take into court because there were so many varying factors. He stated that in estimating speed from skid marks all made on one surface he would expect an accuracy of between two to eight miles an hour, but that in this instance an estimate was complicated by the fact that the car was on and off of two different surfaces, three times. He further stated that the tolerance of his calculations was not sufficient for him to swear that his estimate was accurate. He stated, however, that it was his opinion that the car was traveling at a minimum speed of 85 miles an hour at the time it entered the curve.

Captain De Long testified that he had attended numerous traffic schools and had graduated from the Northwestern University Traffic Institute. Other evidence indicated that from training and experience this witness was qualified by specialized scientific knowledge and skill to estimate the speed of vehicles if he were in possession of sufficient data and information.

■ As a general rule the question of whether a witness qualifies as an expert in a particular field is a matter for determination of the trial court in the exercise of judicial discretion and is reviewable only for abuse. Lone Star Gas Company v. Thomas, Tex.Civ.App., 345 S.W.2d 844; Bell v. Bradshaw, Tex.Civ.App., 342 S.W.2d 185.

■ None of these witnesses, with the possible exception of De Long undertook to show any technical or scientific basis for the estimates of speed they offered. There is no suggestion that the damage suffered by the car, or the skid marks found at the scene, offered any reliable scientific basis for an estimate of speed. Under such circumstances the trial court did not err in rejecting the proferred testimony. Union Bus Lines v. Moulder, Tex.Civ.App., 180 S.W.2d 509; Flores v. Barlow, Tex.Civ. App., 354 S.W.2d 173, error ref., n. r. e.

By its Second Point appellant alleges that the court erred in permitting the jury to view motion pictures of certain tests because the tests were made under circumstances at such variance from those existing at the time of the accident made the basis of this suit as to constitute them irrelevant and of no probative force.

It would unduly lengthen this opinion to attempt a detailed explanation of the front braking system of the vehicle in question. The pictures exhibited an automobile similar to that involved in the accident being operated by the expert witness offered by appellee, and swerving violently to the right upon application of the brakes, the driver not having his hands on the steering wheel.

Generally appellee's theory of the cause of the accident is that the bridge pipe connecting the inboard brake cylinder to the outboard cylinder on the left front wheel became clogged with pieces of the inner lining of the flexible brake fluid hose from the master cylinder, thereby stopping the flow of brake fluid or pressure from the inner to the outer cylinder on the left front wheel. Appellee contends that this caused the outboard braking pad to exert less pressure on the disc than the inboard pad, thereby causing a loss of braking power on the left front wheel. This loss of braking power then caused the car to pull suddenly to the right as it was braked when going into a sharp curve, causing the car to leave the road and overturn.

It is undisputed that after the accident the outer cylinder on the left front wheel of the damaged car was full of hydraulic fluid, as was the entire hydraulic system. The brake pads were almost new and were positioned in close proximity to the disc.

The test presented by motion picture was made with the outboard cylinder on the left front wheel of the test vehicle open to the air. The thickness of the brake pad was not measured, but there was testimony that on visual inspection it was determined that the pad was sufficiently thick for proper braking action, and that both before and after the test in question the brakes operated efficiently.

It is appellant's theory, supported by considerable testimony, that if the brake pads are new and positioned close to the disc, and the outboard cylinder is full of fluid, even if the bridge pipe between the outboard and inboard cylinder is completely blocked, the outboard pad will be held stationary by the hydraulic fluid in the outboard cylinder and the inboard pad pressing against the disc will cause it to come in contact with the stationary pad. Then as a result of the operation of natural laws of physics the pads will press on the disc with equal force and effect.

Mr. Parkinson, appellant's design engineer, testified by deposition (introduced into evidence by appellee) to certain tests he had made, including a test with the outboard cylinder completely exhausted of fluid and with the outboard pad moved to its full extent away from the disc. He testified that under such conditions there would still be some braking action on the outboard side, but less than where the cylinder was full of fluid and the pad near the cylinder. In both instances the vehicle would have a tendency to pull to the right. Where the cylinder was full of fluid and the brake was applied at 70 miles per hour, the effort required to correct the pull to the right was 4 to 6 pound feet; at 60 miles per hour, 3 pound feet; at 40 and 30 miles per hour, 2.5 pound feet. After the fluid had been exhausted from the outer cylinder and the pad moved as far from the disc as possible, the results of the deceleration tests were: at 70 miles per hour, 7 pound feet; at 60 miles per hour, 9 pound feet; and at 40 miles per hour, 5 pound feet. Mr. Parkinson further testified that it required 12 pound feet of effort to make the turns required in parking the car parallel to the road. He also testified that he had no difficulty in keeping the car on a straight course during the maneuvers.

Appellee's witness Doyle testified to certain tests he made at speeds of 30 and 40 miles per hour and that from 7 to 10 foot pounds of effort would be required to correct the tendency to pull to the right. The testimony of both experts discloses that it was quite difficult to accurately measure the amount of effort required to correct the pull. It also appears that there is little difference in the results obtained whether the fluid was removed from the outboard cylinder or it was full. Doyle made no similar tests with the cylinder full. He testified that he installed the brake found on the wrecked car's left front wheel on a similar car and on driving it found that it caused that car to pull strongly to the right. There appears to be no dispute in the testimony but that there would be a strong pull to the right if the outboard cylinder of the left front wheel contained no fluid when the brakes were applied. The test pictures demonstrated nothing that the members of the jury did not have before them in the testimony. It seems obvious that the jury would know that if the brakes were applied under such circumstances while the driver's hands were removed from the steering wheel, the car would make a dangerously abrupt turn to the right.

Appellant's testimony indicates that the differences in the condition of the brakes on appellee's test vehicle from the conditions found on the damaged car after the accident would make little difference in the results of the test. The difference in conditions was clearly shown by the evidence.

■ It is not essential that the conditions of the occurrence and the experiment be identical. Where the dissimilarity between the occurrence conditions and the circumstances of the experiment is minor or is made abundantly clear by explanation, its admissibility rests within the discretion of the trial court. Ft. Worth & Denver Railroad Co. v. Williams, Tex., 375 S.W.2d 279.

■ In this case the failure to have fluid in the outboard cylinder, under Parkinson's testimony, would have necessitated the application of about 2.5 pound feet of effort to keep the car on a straight course during the tests, in excess of the amount that would have been required had the cylinder been full of fluid and pressurized.

It is clear from his testimony that 2.5 pound feet of effort is very little effort. The other differences in condition are clearly minor. The trial court did not abuse his discretion in permitting the introduction of the test since the differences in condition are minor and easily explained. In any event we do not consider that the introduction of this evidence was calculated to cause, nor that it probably did cause, the rendition of an improper judgment. If the trial court erred in permitting the pictures to be shown to the jury, the error was not one which would require that a new trial be granted.

Point of Error III is multifarious. By examining the statement and argument under the point we have determined that the only matters specifically brought to our attention are: (1) As a matter of law under the undisputed evidence the answers made by the jury to Special Issues 11, 12, and 13 will not support the judgment of the trial court; (2) The jury's answer to Issue 14 is supported by no evidence or in the alternative insufficient evidence; (3) The answer to Issue 14 is contrary to the great weight and preponderance of the evidence. This analysis is confirmed by the restatement of Point of Error III in appellant's Postsubmission Brief.

By Special Issue No. 11 the jury found that the component parts of the hose in question were not properly adhered together prior to the assembly of the braking system by Standard Motor Company, Ltd. The jury then found in response to Issues 12 and 13 that the failure was negligence and a proximate cause of the occurrence in question. Appellant's brief contains no points to the effect that these findings are not properly supported by competent evidence.

In answer to Issues 14 and 15 the jury found that after the front left brake assembly was delivered to Standard Motor Company, Ltd., said Company failed to make such an inspection of the adhering qualities of the component parts of the hose in question as would have been made by a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances, which was a proximate cause of the accident. Appellant's Points have not attacked the answer to Issue 15 (proximate cause) as being unsupported by evidence or contrary to the weight and preponderance of the evidence.

The component parts of the braking system installed on the front wheels of the automobile involved in this controversy were not manufactured by appellant. The hose in question connected this system with a master cylinder of the hydraulic system. It was manufactured by the Dunlop Company or its affiliate, the John Bull Company, and delivered to the Girling Company for the installation of certain fittings. The finished hose was then delivered to the appellant, and was installed on the automobile by one of its employees.

The only witness who testified concerning inspection procedures was James Parkinson. He testified that before appellant contracts with a manufacturing company for parts, it insures that its inspection and quality control are up to appellant's requirements and that after the contract is made a roving controller employed by appellant visits them periodically to insure that the quality is maintained. He described the testing procedures employed by the John Bull Company at the various stages in the process of manufacturing the hose and the inspection procedure of the Girling Company at the time the fittings are applied. There is no testimony that the procedures employed by these companies were omitted at the time the hose in question was manufactured. While some of the tests were made on a sampling basis, there is no testimony that the testing procedure was not the usual and customary procedure employed by other concerns manufacturing similar articles.

He testified, however, that from the time the hoses are delivered to appellant's plant they receive no inspection and that appellant has set up no form of testing to confirm the tests made by the manufacturer

and that appellant does not give the hoses any form of inspection whatsoever in its plant. He testified that if on installation it is discovered that the hose does not fit or that there is something apparently wrong with it, it will be "Put to one side and at the end of the day they are returned to the inspection department to see what the fault is, and if necessary to return them to the manufacturer." He testified to other procedures followed by appellant in installing hydraulic fluid, and testing and using the brakes, which would be calculated to remove foreign substances from the hoses and to reveal defective braking. It is not shown how these tests would be effective or helpful in determining whether the component parts of the hose in question were or were not properly adhered together. There is no evidence that an immediate brake failure would result from the failure of the component parts of the hose to adhere.

■■ The evidence clearly is sufficient to support the answer to Issue 14 since it is admitted that no inspection is required by appellant and none in fact made. The jury could conclude from the evidence that on installation apparently defective hoses are sometimes found, and that a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances would have made an inspection of the hose. While the evidence shows that the manufacturer of the hose had established inspection procedures calculated to meet high standards of quality required by appellant, it appears to be well established that appellant has an independent duty to inspect products manufactured by another which it incorporates into its own product and cannot rely alone on the inspections made by the manufacturer. Sears v. Mund-Boilers, Inc., Tex.Civ.App., 336 S.W.2d 243, writ ref., n. r. e.; Annotation, 78 A.L.R.2d 473, 478.

"The courts have generally held that the ultimate manufacturer is liable for negligence in manufacture or inspection of parts of an automobile directly related to its safe operation even if the defective part was supplied by others and the injured party was not in privity of contract." Comstock v. General Motors Corp., 358 Mich. 163, 99 N.W.2d 627, 78 A.L.R.2d 449

By Special Issues 11, 12, and 13, the jury convicted the manufacturer of the hose of negligence, which was the proximate cause of the occurrence made the basis of this suit. No attack was made on the evidence raising and supporting these findings. It is undisputed that appellant assembled the finished product, and marketed it as its own.

■■ Section 400, Restatement of Torts (1934), p. 1086, provides: "One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." The 1948 revision to Comment c under this section states that the assembler is under a duty to exercise care "to secure the adoption of a proper formula or plan and the use of safe materials and to inspect the chattel when made. But he does not escape liability by so doing. He is liable if, because of some negligence in its fabrication or through lack of proper inspection during the process of manufacture, the article is in a dangerously defective condition which the * * * (assembler) could not discover after it was delivered to him."

This statement of the law is supported by respectable authority. Chapman Chemical Co. v. Taylor, 215 Ark. 630, 222 S.W.2d 820, 825; S. Blickman, Inc. v. Chilton, Tex. Civ.App., 114 S.W.2d 646, 649, no writ hist.; Ford Motor Company v. Mathis, 322 F.2d 267, 272 (5th Cir.1963); Green v. Equitable Powder Mfg. Co., 95 F.Supp. 127, 132 (D.Ct.Ark.1951) The judgment is supported on this theory by the jury verdict.

It is unnecessary to consider Point of Error IV dealing with appellee's theory of recovery dealing with warranty, since we have determined that the judgment can be supported on the negligence theories.

The judgment of the trial court is affirmed.