**E–Z MART STORES, INC., Appellant,**

**v.**

**Roger HAVNER, as Next Friend of Kelly Havner and Shelly Havner, Minors; R.D. Crandell, as Administrator of the Estate of Diana Havner, Deceased; R.D. Crandell, Individually; and Mary Crandell, Individually, Appellees.**

No. 06–89–09797–CV.

Court of Appeals of Texas, Texarkana.

May 19, 1992.

Rehearing Overruled June 9, 1992.

Alan Harrel, Atchley, Russell, Waldrop & Hlavinka, Texarkana, Mike A. Hatchell, Ramey, Flock, Jeffus, Crawford, Tyler, for appellant.

Coy Johnson, Sulphur Springs, Robert R. Schwartz, Tyler, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

BLEIL, Justice.

Diana Havner was missing from her clerk's job at an E–Z Mart store. Later, she was found dead. A jury found that E–Z Mart's negligence proximately caused her death and fixed damages. On appeal to this Court, we found the evidence legally and factually insufficient to establish that E–Z Mart caused Diana Havner's death and rendered a take-nothing judgment. Our decision is reported as *E–Z Mart Stores, Inc. v. Havner*, 797 S.W.2d 116 (Tex.App.–Texarkana 1990). Because of our conclu-sions that the evidence was factually and legally insufficient, we did not address issues concerning punitive damages. The supreme court found some evidence of causation in fact; this appeal is now before us on remand from the supreme court for us to conduct a new review of the factual sufficiency of the evidence. Its decision is reported as *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456 (Tex.1992).

E–Z Mart was found to be negligent at trial and has never disputed its negligence on appeal. With the benefit of the supreme court's legal conclusions and guidance, we now turn to a review of the narrow question of the factual sufficiency of the evidence to support the jury's finding that E–Z Mart caused the death of Diana Havner.

■ The Texas Constitution makes the courts of appeals conclusive on all questions of fact brought before them on appeal. TEX. CONST. art. V, § 6. This provision of the constitution, known as the factual conclusivity clause, acts as a limitation on the judicial authority of the supreme court and confines its authority to questions of law. *Choate v. San Antonio & A.P. Ry. Co.*, 91 Tex. 406, 44 S.W. 69, 69 (1898). In light of this limitation, the supreme court has directed the lower appellate courts to consider and weigh all the evidence in order to determine whether evidence was insufficient. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ More recently, the supreme court has reaffirmed the authority and duty of courts of appeals to exercise their conclusive authority to decide questions of factual sufficiency of the evidence. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 649–51 (Tex.1988); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 633–35 (Tex.1986). In *Pool*, courts of appeals were admonished that, when reversing on factual insufficiency grounds, those courts should detail the relevant evidence and clearly state why it is insufficient so that the supreme court might determine if the requirements of *In re King's Estate* have been satisfied. *Pool*

*v. Ford Motor Co.*, 715 S.W.2d at 635. We are reversing this case because we find the evidence factually insufficient; therefore, we apply the *Pool* admonitions in conducting our factual review of all the evidence.

Much of the evidence has been stated in the two earlier opinions.[1] However, because this is a determination of the factual sufficiency of the evidence to show that E–Z Mart caused the death of Diana Havner, we are required to consider and weigh all of the evidence.

Diana Havner worked as a clerk at an E–Z Mart convenience store located on Interstate Highway 30 in Sulphur Springs. She reported before 11:00 p.m. August 1, 1987, to work the night shift, which was to end at 7:00 a.m. the next day. Shortly before 5:00 a.m., Sulphur Springs police officer Jay Owens drove onto the E–Z Mart parking lot, noticing a woman standing outside the store looking in. No one was in the store.

Inside the store, there was no sign of a struggle. A partially filled cup of coffee, a cigarette case, and a burned-down cigarette in an ashtray were found. Diana Havner was a smoker and a coffee drinker. Her purse, containing money and a handgun, was behind the counter. Money was missing from the cash register, although certain large bills were found where, presumably, Diana Havner had hidden them, as was the practice for the clerks at this store. Her automobile was parked in the parking lot.

Five days later, the Sulphur Springs police found Diana Havner's partially clad, badly mutilated body in a remote, undeveloped residential area of the city. The medical examiner determined that she died as a result of blunt injuries to the head which caused massive destruction of the skull. The criminal acts surrounding Diana Havner's death remain unsolved.

E–Z Mart had purchased this convenience store and several others located in Sulphur Springs from Shop–A–Minute stores about four months before Havner's

death. The store is located in a residential area of Sulphur Springs and is close to an apartment complex and a church. The neighborhood is described as residential and basically free of criminal incidents. In the seven years that this store had existed, there were no previous incidents of violent crime.

Elvin Hickman, for seven years the director of security for E–Z Mart, previously served in the military and the Texarkana, Texas, police department as, among other things, crime prevention officer. He holds an associate degree in law enforcement from Texarkana College and has attended various other police schools. He testified that E–Z Mart employed district supervisors who provide training to store managers who, in turn, are responsible for individual training.

The security personnel for E–Z Mart travel between the stores to evaluate the security measures in effect and to recommend changes. Each store keeps reports of criminal incidents, and the security department monitors these reports to detect trends and to keep abreast of security developments. When the company purchases a new store, Hickman evaluates the store for compliance with E–Z Mart policies and procedures and determines what to do to bring it up to E–Z Mart standards. After this particular convenience store was purchased, E–Z Mart installed new exterior lighting to improve the nighttime visibility in front of the store.

E–Z Mart had expanded its security program in 1985 to 1986 and incorporated its program into the company's policies and procedures manual, which is given to E–Z Mart employees. This security program is based upon studies of the effectiveness of crime prevention measures performed by experts in convenience store crime. E–Z Mart's program is designed to protect employees from injury during a robbery and is described as one of noncombativeness, designed to prevent a nonviolent robbery from escalating into a violent one. Em-

---

1. *See E–Z Mart Stores, Inc. v. Havner*, 797 S.W.2d 116 (Tex.App.–Texarkana 1990), *rev'd,*

825 S.W.2d 456 (Tex.1992).

ployees are instructed to cooperate with a robber and not to obstruct or interfere with the robbery. E–Z Mart was said to have been negligent in many particulars, and in defense sought to show that many of the particular allegations had nothing to do with the cause of Diana Havner's death. Evidence indicated that the improved lighting put in by E–Z Mart caused that lighting not to be a factor. The fact that there was not a drop safe was not considered to be a factor because the general public usually is not aware of whether there is a drop safe. Factual studies indicated that the presence of two clerks and an alarm system, in order to prevent crime in convenience stores, do not necessarily prevent crime.[2]

As noted by the supreme court, the Havners' attorney put on evidence that the store had poor external lighting, the windows were blocked with promotional signs, the employees were untrained as to what to do when abducted, the telephone system was inadequate, and the store failed to have two clerks on late night duty.[3] E–Z Mart countered with evidence that it put additional lights outside the store upon purchase; that no signs blocked the glass panes where the clerk was and that visibility was adequate; that employees were trained to be noncombative during a robbery, which was believed the safest and most effective response; that the telephone system allowed the clerk to call the operator; and that studies show that having two clerks on duty did not prevent or reduce criminal acts against clerks.

On appeal, E–Z Mart accepts that it was negligent, but argues that its conduct is not shown to have caused Havner's death. The only real conduct on its part which is argued as being responsible for her death is the lack of an alarm system.

E–Z Mart put on evidence which showed that an alarm system had no deterrent effect on robberies. Before E–Z Mart purchased this store, it had a silent alarm button. However, this silent alarm had been activated by mistake in the past, and the police response time had varied. When the police were in close proximity to the store, it took them three to four minutes to arrive. When the police were farther away, the response time was ten to fifteen minutes. Employees of this store characterized the police response to the false alarms as being slow. E–Z Mart's security policy does not include the use of alarms, and the alarm in place at this store was removed. The policy is based on E–Z Mart's belief that alarms do not prevent robberies, that any action by the clerk to set off the alarm could cause the robber to harm the clerk, and that if the alarm is activated and the police arrive when the robbery is in progress, it can create a hostage-taking situation. E–Z Mart's policy is based on several studies on the use of alarms in convenience stores.[4]

There are also many problems with alarms, and E–Z Mart took this into consideration when determining whether the risks of an alarm outweighed the benefits. Silent alarms cause problems with false alarms, which, after being activated mistakenly a number of times, can cause the police to become complacent in their response to them. At the time of trial, E–Z Mart had alarm systems in two stores, and neither system had reduced or prevented armed robberies. Further, in one of the stores where an alarm was located, there had been an average of four robberies per year and no suspects have been apprehended.

As the supreme court observed, because there have been no witnesses located, the

2. A primary study was one done for the Southland Corporation, owner of the 7–Eleven convenience stores. This study concluded that two night clerks on duty had no effect on deterring crime.

3. 825 S.W.2d at 459.

4. One of these studies includes research done by Athena Research for the 7–Eleven convenience

store chain. This study concluded that alarm systems and cameras have no deterrent effects on robberies. When 7–Eleven pulled alarm systems out of its New Orleans stores, there was no significant increase in the rate of armed robberies. E–Z Mart's policy is also based on experience in the banking industry, which has shown that cameras and alarm systems do not have a deterrent effect on robberies.

circumstances surrounding Diana Havner's death may never be known.[5] No one has come forward to date, so far as is known, to answer the many factual questions about the case.

■ Our initial holding was based upon the premise that no one knew who or what caused the death and that the testimony which most showed that E–Z Mart caused Diana Havner's death was nothing more than speculation or conjecture about nonscientific or nontechnical matters. We now know that the testimony was some evidence that E–Z Mart caused Diana Havner's death.

The supreme court observed that there were four expert witnesses showing causation.[6] The court apparently was referring to Sulphur Springs police chief Donnie Lewis, police sergeant Robert Stidham, Norman Bottom, and Norman Gray, a former police officer.[7] Although we previously considered what each of these witnesses added to show that E–Z Mart, in fact, caused Diana Havner's death, we did not treat Stidham as an expert witness and did not discuss Bottom's testimony because it was relevant to the question of negligence only and not relevant to the proximate cause question.

Donnie Lewis, a thirty-nine-year-old Sulphur Springs resident, was the chief of police for the city of Sulphur Springs. A high school graduate, after military service he obtained a degree in criminal justice from East Texas State University. Lewis was stipulated to be an expert in law enforcement. Lewis conducted an investigation into Havner's disappearance and made a determination that a robbery and an abduction had occurred. He testified that:

I theorized, and I still have the same theory today, that when Ms. Havner was taken they were using force with her and if you had a gun to your head and was told not to make any sudden moves, you would do exactly as they say, as you or I would. That's just using common sense.

He also testified that alarm systems were highly recommended and that there was a

---

**5.** 825 S.W.2d at 460. The supreme court also said that we placed on the Havners the burden of "negating all other possible causes." 825 S.W.2d at 460. We did not intend to place such an onerous burden of proof and regret anything we said that may have led a reader to so interpret our written opinion.

**6.** 825 S.W.2d at 460. We treated Stidham as a lay witness because the statement of facts fails to show that he was treated as an expert by the trial court or by either side to the litigation. Clearly, he was not offered as an expert witness, not determined to be one by the court, nor stipulated to be an expert. Unless it can be said that any police officer with a high school diploma and thirteen years of police work experience is per se an expert, we believe our characterization to be fair under the facts of record.

Much of Lewis' testimony concerned the lack of security at the store. He testified about poor lighting on the side and back of the store. He also talked about how drop safes (safes set in concrete into which money can be put into and not taken out) prevent crime. He said that the person who came in to rob the store and take Diana Havner out of the store would not have stopped to search for her purse or her handgun. He said that, if someone asked Diana Havner whether there was other money anywhere else in the store, she would have had to say yes. Then, Lewis testified, that's when the criminals think the clerk is hiding something in the back of the store and then is when something hap-

pens to a clerk, implying serious injury or death. Many times the clerk may be taken to the back of the store and raped, Lewis said. He also discussed how the store could have two clerks and how this makes the store a safer place. At that point, the Havners' attorney inquired about causation:

Q. Do you have an opinion as to whether or not Diana Havner would have been taken from that store, raped and murdered, had they had a security system there?

A. My honest true opinion of that is Diana would not have been taken out of that store. We would have been there and we would not be in here today.

In context, he may have been saying that she may have been killed and/or raped in the back of the store and left there. This response to the Havners' attorney's question may be more than a scintilla of evidence of causation, but is not persuasive in the context of his testimony.

**7.** We did not treat Sergeant Stidham as an expert witness based on the statement of facts. However, even assuming that Stidham was a qualified expert who was expressing expert opinions that Diana Havner was robbed, abducted, raped, and murdered, we give his opinion that E–Z Mart caused her death little weight because that opinion is obviously conjecture on his part. Bottom, while well qualified as a security expert, expressed no opinion on causation.

lack of safety precautions taken by E–Z Mart. He spoke of it in the following manner:

> I'm being honest with you when I say this. With their particular security and setup, no alarms and drop safe, employee training, what I found out through this investigation, you probably could have sent a high school boy out there to do as well from what we found in our investigation.

Lewis gave extensive other testimony, but gave little testimony which might be of assistance to a trier of fact in determining whether E–Z Mart caused Diana Havner's death.

Norman Bottom, without question, was qualified as an expert on security. Bottom holds a baccalaureate degree from Texas Tech University, a master of arts in cultural anthropology and a Ph.D. in government from the Claremont Graduate School in Los Angeles County, California. He holds the highest certifications available to security practitioners and has twenty-two years of security experience. He has spoken, written and taught on the subject of security.[8] As noted by the supreme court, Bottom gave extensive testimony about the inadequacies of the security at the E–Z Mart store relating to the lighting, the view from the outside of the store, the telephone, the lack of an alarm system, and the check cashing policy.[9] Based upon his experience and expertise, Bottom concluded that E–Z Mart's security was deficient.[10] Bottom did not express an opinion on whether E–Z

Mart's negligence caused Diana Havner's death.

Norman Gray perhaps gave the strongest evidence that E–Z Mart's negligence caused Diana Havner's death. This might be said because he is the only witness who was qualified as an expert who testified directly as to the cause of death.[11] Gray, a former policeman for the city of Greenville, Hunt County deputy sheriff, and private investigator, testified for the Havners. At the time of trial, he was manager of Greenville Alarm Systems, and the trial court ruled that he was qualified to testify as an alarm expert. After testifying concerning various alarm systems, he gave his opinion about whether Diana Havner would be alive had there been an alarm system at E–Z Mart at the time of her death. He testified as follows:

> I would have to say it this way: You cannot be completely sure, but I feel like all the time that was consumed in taking the money and getting the lady to leave the store, the police would have had a great opportunity to arrive before she was carried away from the place of business.[12]

Gray's opinion was some evidence that E–Z Mart's negligence caused Diana Havner's death.

No one knows exactly how Diana Havner was killed, or why. All witnesses, if asked, conceded this. There is no direct evidence that E–Z Mart's negligence proximately caused Diana Havner's death except the

---

**8.** As pointed out by the supreme court, Bottom was the founding chairman of the nonprofit International Foundation for Protection Officers and, at the time of trial, was editor-in-chief of a publication on security administration. He had taught security for seven years and authored four books and over one hundred articles on the subject. 825 S.W.2d at 460 n. 2.

**9.** 825 S.W.2d at 459.

**10.** In our prior opinion, we did not discuss Bottom's testimony because it bears more on the issue of negligence than on the issue of causation.

**11.** The supreme court said that, "Regarding ... these four experts, the court of appeals failed to discuss two and rejected the other two." 825

S.W.2d at 460. Previously, we did reject Gray's causation testimony, holding that his opinion "was merely his speculation or feelings about nonscientific or nontechnical matters and does not rise to probative evidence of proximate cause. *See generally* 2 R. RAY, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL §§ 1399–1401 (Texas Practice 1980 & Supp.1990)." *E–Z Mart Stores, Inc. v. Havner,* 797 S.W.2d at 119. We treated Stidham as a lay witness, as previously noted. We lightly regarded Lewis' and Gray's causation opinion testimony and concluded that Bottom's testimony pertained to E–Z Mart's deficiencies, not proximate cause.

**12.** Despite this testimony, there was, of course, no evidence of the time consumed in taking the money or in taking Diana Havner from the store.

opinion discussed. The opinions given that E–Z Mart caused Diana Havner's death are mere conjecture. Those opinions are probably equivalent to that which might be given by whom Chief Lewis referred to hypothetically as "a high school boy."[13] That is to say, anyone might have an opinion based on all of the known facts and circumstances.[14] Gray testified as an expert, without objection, and we quoted his opinion, which, although it is some evidence of causation, is not compelling. In considering and weighing all the evidence, we give little weight to the opinion testimony as to what caused Diana Havner's death because all who gave an opinion conceded that no identified person knows whether any conduct on E–Z Mart's part caused her death.

We have thoroughly reviewed anew all of the evidence, with the benefit of the supreme court's conclusion that the evidence is legally sufficient to support the jury's finding as to causation. Viewing the testimony of all witnesses—fact and expert—and considering all of the other evidentiary matters, it is now clear that some evidence supports the verdict.

A tragedy has occurred. Diana Havner is dead, and her loved ones, too, have suffered monumental losses. The awful facts do not make our job any easier. The exercise of fact jurisdiction—determining whether the evidence is factually sufficient—is always difficult and often troubling. But, we are required to exercise this constitutionally-mandated duty. TEX. CONST. art. V, § 6. After our review of all the evidence, many unknowns remain. We do not know who the assailant was, whether he, she or they were armed, whether Diana Havner was ordered from the premises, taken by ruse, or otherwise; and we do not know whether she was actually abducted. There is far too little known about the causes or motivations behind the criminal acts committed against Diana Havner for this Court to conclude that there is factually sufficient evidence that E–Z Mart's conduct caused the harm to Diana Havner. Based on our new review of all of the evidence and circumstances, and considering all of the supreme court's guidance, we conclude that the evidence is factually insufficient to support the jury's finding that E–Z Mart's negligence caused Diana Havner's death.

We reverse the cause and remand it for a new trial.

13. No witness was shown to be qualified as to causation, nor was any witness knowledgeable of the legal definition of proximate cause. An expert's opinion on ultimate issues such as proximate cause must be based upon proper legal concepts. See Birchfield v. Texarkana Memorial Hosp., 747 S.W.2d 361, 365 (Tex.1987); E–Z Mart Stores, Inc. v. Terry, 794 S.W.2d 63, 64 (Tex.App.—Texarkana 1990, writ denied).

14. In a dissenting opinion in the supreme court, Justice Cornyn spoke to whether or not expert testimony on causation was helpful to the jury in this case. He wrote that:

The specialized knowledge of the experts is simply of no assistance to the trier of fact under these circumstances. The jury is equally capable of engaging in the same speculation. Therefore, the experts' opinions are not helpful, but superfluous. See e.g. Morgan v. Compugraphic Corp., 675 S.W.2d 729, 733 (Tex.1984); Lopez v. City Towing Assoc., 754 S.W.2d 254, 260 (Tex.App.—San Antonio 1988, writ denied); Thompson v. Mayes, 707 S.W.2d 951, 957 (Tex.App.—Eastland 1986, writ ref'd n.r.e.); Wendorf, Schlueter & Barton, Texas Rules of Evidence Manual VII–15—16 (3d ed. 1991).

There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained laymen would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952) (cited in Notes of Advisory Committee, Fed.R.Evid. 702). And, such speculation can no more support an expert opinion than it can support a judgment in a circumstantial evidence case based on competing, but equally probable, inferences from the evidence. Such evidence is simply too tenuous a basis for rendition of a judgment in a court of law.

825 S.W.2d at 465–66 (Cornyn, J., dissenting). Perhaps the reasons why Justice Cornyn, joined by Justice Hecht, may have felt that the specialized knowledge of experts may not have been of assistance to the jury under these circumstances are related to what Police Chief Lewis was thinking about when he spoke of his fictional "high school boy," who could have investigated the case as well as the police department.

GRANT, Justice, dissenting.

I dissent. The evidence was sufficient to support the jury's verdict on proximate cause. Cause in fact was established by sufficient circumstantial evidence and sufficient expert testimony, and foreseeability was not in issue. The majority opinion failed to apply the proper standards in three respects: (1) the proper standard concerning inferences, (2) the proper standard concerning expert witnesses, and (3) the proper standard in considering all of the evidence.

## THE PROPER STANDARD CONCERNING INFERENCES

When there are possible conflicting inferences and conclusions, it is the function of the jury to make a choice, and whether the reviewing court agrees with that choice is not the proper test. *Pan American Petroleum Corp. v. Orr*, 319 F.2d 612 (5th Cir. 1963). When an inference of the nonexistence of a fact is just as reasonable as an inference of the existence of a fact and there is no direct evidence on the issue, the question may not be resolved by the jury in favor of the party having the burden of proof that the fact exists. *Cambridge Mutual Fire Ins. Co. v. Shoemake*, 403 S.W.2d 858 (Tex.Civ.App.—Dallas 1966, no writ). In the present case, however, there was direct evidence on the issue from three experts who testified as to cause in fact, and the nonexistence of the facts was not just as reasonable as the inference from the circumstantial evidence of the existence of the facts.

Under the subject of circumstantial evidence in books of legal quotations, the quotation that often appears is this one from the early American writer Henry David Thoreau: "Some circumstantial evidence is very strong, as when you find a trout in the milk." The first reaction to this statement by people in our time would probably be, "What was Thoreau talking about?" But this is not a nonsensical proposition. If we had lived in Thoreau's time when there were no health department regulations and consumer protection agencies to

oversee the contents of milk and when it was a common practice by milk suppliers to increase the volume of the milk by adding water, we would have well understood that a trout in our milk would strongly suggest that our milk supplier had added water from a nearby stream. Inferences are not made in a vacuum but are formulated on the basis of human knowledge and experience.

In our time, when a dependable convenience store clerk is missing in the wee hours of the morning, when there is cash missing from the store, which has been left unattended, and when the clerk's mutilated body is later found, this is strong circumstantial evidence. In our time, can we say it would be illogical for a jury to draw an inference from these circumstances that a robbery, abduction, and murder had occurred? Clear reasoning says we cannot; the majority opinion says that we can and must.

In the majority opinion, the court finds that there is insufficient evidence of cause in fact because "no one knew who or what caused the death" of Diana Havner, or whether or not she was abducted. It is tragically true that no one has been convicted of her murder, but the name, age, and identity of the perpetrator is not necessary to establish the proof in the case. The absence of this information does not mean there is a great mystery as to what occurred on the night in question. When presented with the circumstances, except for a few people who believe everything is caused by aliens from outer space and except for the two justices favoring the majority opinion, any citizen of the State of Texas could conclude that it was highly probable that robbery, abduction and rape were committed.

As this Court said in *American Surety Co. of New York v. Rushing*, 356 S.W.2d 817 (Tex.Civ.App.–Texarkana 1962, writ ref'd n.r.e.), an inference can be drawn only from facts and evidence and must be based on *probabilities*. The plaintiff is not required to prove the case beyond a reasonable doubt, nor does the plaintiff need to negate entirely the possibility that the de-

fendant's conduct was not a cause. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456 (Tex.1992). It is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the defendant was a cause of the event than that it was not. The plaintiff is not required to prove that the defendant's acts or omissions were the *sole* proximate cause, but only that the defendant's acts or omissions were *a* cause. *Missouri Pacific Railroad Co. v. American Statesman*, 552 S.W.2d 99, 103 (Tex.1977).

Proximate cause itself is a test of common experience applied to human conduct. *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231 (Tex.App.–Dallas 1985, writ ref'd n.r.e.). The fact of causation is incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise. It has long been held in Texas that proximate cause can be established by circumstantial evidence.[15] *Gilbert v. Haigler*, 363 S.W.2d 337 (Tex.Civ.App.–Houston 1962, writ ref'd n.r.e.). Considering the vicissitudes of human affairs, it is always possible to imagine some possible occurrence that might have altered the probable consequences, but the test remains one of probability. The majority does not seek probability and does not mention probability, but instead wonders who the perpetrator was and what his motivations might have been. These unknowns do not thwart the ability of the jury to make a probable inference from the known facts.

The Havners were only required to prove their case by a preponderance of the evidence. *See Bock v. Fellman Dry Goods Co.*, 212 S.W. 635, 637 (Tex.Comm'n App. 1919, holding approved). The majority opinion erroneously requires proof of an absolute certainty.

## THE PROPER STANDARD CONCERNING EXPERT WITNESSES

In its opinion, the majority refused to consider the expert opinion of Robert Stidham based upon an erroneous standard or no standard, chose to ignore the testimony of Norman Bottom and Norman Gray, and chose to distort the testimony of Donnie Lewis.

The witnesses were not asked to testify as to proximate cause but to cause in fact.[16] The majority opinion tells us that Robert Stidham was a lay witness because the statement of facts fails to show that he was treated as an expert by the trial court or by either side to the litigation. In footnote six, the majority concluded that Sergeant Stidham was not an expert witness based on the statement of facts. Stidham testified that he had basic and advanced certification with the law enforcement standards in education; that he had numerous in-service training courses, such as crime scene investigations, drug and narcotics investigations, auto theft investigations, and basic fingerprints; that crime scene investigation is his daily job; and that he had thirteen years' experience with the Sulphur Springs Police Department.

For a person to qualify as an expert witness, it must be shown that he possesses a higher degree of knowledge of a matter in issue than the jurors themselves possess. *International Security Life Ins. Co. v. Beauchamp*, 464 S.W.2d 679 (Tex.Civ.App.–Amarillo 1971, no writ). It is an insult to every experienced crime investigator in this State to say that Stidham's experience and extensive training does not qualify him, beyond the average juror, to reach conclusions based upon his investigation. Furthermore, his opinion must be of assistance to the fact finder. The jury was

---

**15.** Circumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred. *See* W. Page Keeton, et al., Prosser & Keeton on the Law of Torts ⸗ 41, at 269–70 (5th ed. 1984).

**16.** Footnote thirteen of the majority opinion suggests that no witness was shown to be qualified as to causation, nor was any witness knowl-

edgeable of the legal definition of proximate cause. An expert witness can testify as to causation of the death or injury. *Connecticut General Life Ins. Co. v. Tommie*, 619 S.W.2d 199 (Tex. Civ.App.—Texarkana 1981, writ ref'd n.r.e.). The witnesses were not asked about proximate cause, which includes legal ramifications that cause in fact does not.

seeking an answer to the question of causation, and this testimony was beneficial to them.

As to whether Stidham was presented as an expert witness at the trial, there are no magic words that the attorney is required to say to present an expert witness, nor is the trial judge required to anoint the witness as an expert in any way other than ruling on objections. Whether the witness is sufficiently qualified as an expert witness on questions propounded to him or her is a matter for the trial court to determine after the witness has stated his or her training and experience. Stidham testified as to his qualifications, and then he was asked numerous questions about his opinions from the attorneys on both sides. No objection was made to his expertise or to his opinion testimony.

A trial court's conclusion as to an expert witness's qualification will not be disturbed on appeal unless it is shown that the trial court abused its discretion. *Standard Motor Co. v. Blood*, 380 S.W.2d 651 (Tex.Civ. App.–Houston [1st Dist.] 1964, writ dism'd by agr.). The only indications that we have as to the trial court's opinion and the jury's opinion are the jury's verdict and the trial court's judgment. The majority does not state what standard they used to determine that Stidham's opinions should not be considered, but it is obvious that the wrong standard or no standard was used. It is impossible to read this record and conclude that the attorneys and the judge did not recognize that Stidham was testifying as an expert. Furthermore, this ruling violates the law of the case because the Supreme Court has already determined that Stidham was testifying as an expert:

> Each was qualified as an expert without objection. Both Detective Sergeant Stidham and Chief Lewis were law enforcement veterans who had personally inspected the crime scene and participated actively in the murder investigation. Both possessed extensive personal knowledge and perception of the facts underlying their opinions. An investigating officer may properly testify as to causation. *Louder v. DeLeon*, 754 S.W.2d 148 (Tex.1988) (per curiam). Giv-

en their knowledge of the underlying facts and their expertise, the witnesses' testimony met the requirement of assisting the fact-finder and should not be disregarded as insisted by the dissent. *Havner v. E–Z Mart Stores*, 825 S.W.2d at 460.

On the next expert witness, Donnie Lewis, the majority concludes that in the context of his conclusion he may have meant that Diana Havner would have been raped and killed in the back of the store and left there instead of being taken from the premises and raped and killed. This interpretation is in diametric contrast with all of Lewis's other testimony. (See footnote nine of the majority opinion). The testimony in question was the following:

> Q. Do you have an opinion as to whether or not Diana Havner would have been taken from that store, raped and murdered, had they had a security system there?
>
> A. My honest true opinion of that is Diana would not have been taken out of that store. *We would have been there and we would not be in here today.*

(Emphasis added.)

The majority opinion ignores the last sentence in Lewis's testimony. The context does not indicate that Diana Havner would have been raped and murdered even if E–Z Mart had had an adequate security system. Such a reading is strained and distorted. Lewis testified that the store had no security system and that the employees had no training. He described the E–Z Mart employee manual as only informing the employees how to be calm in case of a robbery, how to protect E–Z Mart's money, and how to fill out various forms about the occurrence. He was especially critical of the manual instruction that the employee was to comply with the robber's instructions completely. He testified that Havner should not have cooperated in being taken from the scene, but should have fallen to the floor, passed out, or done anything but get in the vehicle with the robber.

An examination of the context [17] reveals that Lewis testified on that same question a little later in the proceeding that

> In this case, I feel like (if) there had been an alarm system we would have been there when the alarm was set off by a panic button or whatever system they put in and we would have been and you would not—*we don't feel like we would have had the abduction and rape and murder* and on from there, plus possibly still having this person running our streets today.

(Emphasis added.)

Lewis clearly was testifying that the court proceeding would not be held because Diana Havner would not have been killed if there had been an adequate security system.

The majority opinion dismisses Dr. Norman Bottom's testimony because he did not reach a conclusion about causation, but Bottom's testimony points up many deficiencies in E–Z Mart's failure to furnish Havner with a safe place to work. From these deficiencies, strong inferences could be drawn by the jury regarding E–Z Mart's failure to provide adequate security. The majority erred in not considering the inferences that can be drawn from these admitted acts of negligence and the subsequent harm.

The majority recognizes Norman Gray's expertise and direct testimony on causation but finds that it is not compelling because "[n]o one knows how Diana Havner was killed, or why." There was evidence from the state of the body that Diana Havner was killed with blows from a blunt instrument and that she was raped. The evidence also strongly suggests that the store

was robbed. There was no security system in the store. We need not delve into the sociological reasons for the heinous conduct of the perpetrator in order to assess the absence of a store security system. The majority has not properly considered the expert testimony offered in that regard.

The majority opinion is faced with a catch–22 situation: The record contains sufficient expert testimony to support the jury's finding, so the majority says that an expert opinion is not needed. If an expert opinion is not needed to make inferences from the known facts, then these witnesses could reach such conclusions as laymen, in Lewis's words, "just using common sense," and the jury could likewise infer such a conclusion from the evidence without the need for expert opinions.

## THE PROPER STANDARD IN CONSIDERING ALL THE EVIDENCE

The majority properly cites but fails to follow the standard requiring that when considering an insufficient evidence point of error, we must consider all of the evidence. The majority, however, details and states as facts the evidence offered by E–Z Mart but gives short shrift to all of the evidence to the contrary. An example is that the opinion states as a fact that, "When the police were in close proximity to the store, it took them three to four minutes to arrive. When the police were farther away, the response time was ten to fifteen minutes." [18] In addition to Gray's testimony that if an alarm system had been in place he did not believe that a robber could have left the scene with the clerk

17. Lewis's reference to a "high school boy" is also ripped from context by the majority. Lewis was testifying about the lack of proper training of the E–Z Mart employees and how this lack of training and lack of a security system hampered their ability to find the perpetrator of the criminal acts.

18. I agree with the majority that the response time was an important factor in determining causation. This case has some similarities to *McCane–Sondock Protection Systems, Inc. v. Emmittee*, 540 S.W.2d 764 (Tex.Civ.App.—East-

land 1976, no writ). In the *Emmittee* case, the question was whether the failure of the defendant to install a burglar alarm system properly was a cause of the loss from a robbery. The principal difference in that case and the present case is that there was no testimony in the present case about the actual amount of time that the robber spent at the scene of the holdup. Although there is no direct testimony on it in the present case, there was expert opinion that the police could have arrived at the scene before the robber escaped if there had been an alarm.

before the police arrived, Chief of Police Donnie Lewis testified about an approximate arrival time for the police: In the daytime, it would have probably taken two and a half minutes for the police to reach the store after the alarm was set off and at four o'clock in the morning (the approximate time that the robbery occurred), the police could probably arrive in "a minute to a minute and a half or possibly quicker." [19] The majority ignored this testimony.

Another example of the majority's failure to consider all of the evidence concerns the deterrent of having two employees instead of one employee on the late night shift. The majority twice mentions in its opinion that studies show that having two clerks did not prevent or reduce criminal acts against clerks. The majority chose to ignore the testimony of Bottom that in Gainesville, Florida, the city passed an ordinance that required two clerks to be on duty in convenience stores from dark to dawn and that this ordinance significantly reduced the number of robberies, and that Kent, Ohio, had the same experience. The majority has not considered all of the relevant evidence.

After considering all the evidence, including inferences that may be properly drawn, expert opinions, and all the evidence offered by the appellee, it is clear that the jury had sufficient evidence upon which to determine the answer to the question of proximate cause.

I therefore respectfully dissent.

19. Lewis also testified:

You're going to have to be awful fast to take a clerk out of the store with an alarm system going off. In this town I've never seen it happen except in this case and there wasn't an alarm. You would have to be awful fast. It might work in Dallas but I don't think it would work here.

He also testified that the alarm that the store had before E–Z Mart took over was an automatic dispatch and received top priority.